[Civ. No. 22584. Second Dist., Div. Two. June 4, 1958.]

HARRIS G. ASHBURN et al., Respondents, v. L. M. MILLER et al., Appellants.

72

74

Conroy & Conroy for Appellants.

Melvin Klarin and Jerome D. Savenick for Respondents.

ASHBURN, J.—Plaintiffs Harris G. Ashburn and Virginia
E. Ashburn, husband and wife, sued defendants Lawrence
M. Miller and Doris L. Miller, husband and wife, for damages
for fraud in the sale to them of a hillside lot in the Mulholland
Drive—Laurel Canyon area of Los Angeles, the fraud con-
sisting of misrepresentations concerning the fact that the
lot consisted largely of uncompacted fill. The lot sloped
downward to the east and the rear or north. In the process
of preparing a site for building a residence plaintiffs had to
excavate filled material varying in depth from 6 feet to 13
feet, a total of some 1,000 to 1,100 cubic yards, and also had
to bring in approximately 500 cubic yards of dirt in order to
compact a suitable building site, all at a cost of $1,605.75.
The court, after a nonjury trial, found for plaintiffs on the
charge of fraud and awarded damages in the sum of $3,000.
Defendants appeal, urging insufficiency of the evidence to
prove a fraud or to sustain the award of damages. The
evidence is conflicting upon both of said issues.

We stated the applicable principles of review of con-
flicting evidence in *New* v. *New,* 148 Cal.App.2d 372, 383-
384 [306 P.2d 987] : "The appellate court must accept as
established all facts and all inferences favorable to respondent
which find substantial support in the evidence. 'And
where appellant urges the insufficiency of the evidence to
sustain the findings . . . the rule is that, "Such contention
*requires defendants to demonstrate* that there is no substantial
evidence to support the challenged findings." (*Nichols* v.
*Mitchell,* 32 Cal.2d 598, 600 [197 P.2d 550].) (Emphasis
added.) It is said in *Crawford* v. *Southern Pac. Co.,*
3 Cal.2d 427, 429 [45 P.2d 183], that: "It is an elementary,
but often overlooked principle of law, that when a verdict
is attacked as being unsupported, the power of the appellate
court begins and ends with a determination as to whether
there is any substantial evidence, contradicted or uncontra-
dicted, which will support the conclusion reached by the
jury. When two or more inferences can be reasonably
deduced from the facts, the reviewing court is without
power to substitute its deduction for those of the trial court." '
(*Hartzell* v. *Myall,* 115 Cal.App.2d 670, 673 [252 P.2d 676].)
. . . *Industrial Indem. Co.* v. *Golden State Co.,* 117 Cal.

App.2d 519, 538 [256 P.2d 677]: '[I]t is settled law that if conflicting inferences may reasonably be drawn from the evidence, even if it is uncontradicted or all facts are admitted, which inference shall be drawn is a question for the trier of facts and its decision cannot be set aside by the appellate court. .... ██ Only where there is no conflict in the evidence *and no conflicting inferences can be drawn therefrom* does the finding of the trial court amount to a conclusion of law and is the finding not binding on a reviewing court.' "

██ The evidence adequately supports the finding of fraud. The subject lot adjoins the residence of defendants Miller and had been owned by them since November, 1952. Plaintiffs first talked to defendant[1] about this property in November, 1954. They agreed to purchase it on January 7, 1955, opened an escrow on March 18, 1955, which was closed on March 30, 1955. Mr. Ashburn was and had been for eight years business manager of the Music Department of Universal Pictures. Before that he and his wife had been vaudeville performers, doing a dance number. They had had no experience with filled hillside lots but had been alerted to the supposed dangers of such building sites by what they had read and heard. They admired this particular lot especially. On the November occasion they found Mr. Miller on the property, which had a "for sale" sign upon it. They asked the price and according to plaintiff defendant said $7,900 or $7,950; they said that was too much money for them and Miller responded: "Well, the beautiful part of this lot is that it's solid and in the hills it's unusual to find a practically level lot that is solid." Mrs. Ashburn testified, concerning the same conversation: "Then, as we were saying that it was a lot of course that was way above our figure, he said, 'If you are interested in the hills here, that is not expensive.' He said, 'If you buy a hillside lot, most of it is either fill or cutting.' I said, 'Is there any fill on this lot?' I was the one that asked him. He said, 'This is a solid building site. As you can see for yourself, there is hardly any grade.' He said, 'That is why I am getting this price for this lot.' He said, 'You can find cheaper lots, yes, but,' he said, 'because there is hardly any grade and it is a solid lot, that is why I am able to ask this price for it.' "

The parties met again at the Miller home on the evening

---

[1]The singular "plaintiff" or "defendant," as used herein, will refer in each instance to the husband unless otherwise indicated.

of January 7, 1955. Mr. Ashburn testified: "We went up there and we told him we had been looking at a lot of lots, that some of them were filled, and that inasmuch as he had stated that this one was solid, that we were interested in it, but we wanted to know whether he wouldn't come down on the price of $7,950. They wanted to know how high we could go. I said we wanted to spend between $5,000 and $6,000, but in this case it being a solid lot we would go to $7,000. So Mrs. Miller suggested that inasmuch as we weren't too far apart that they would make the price $7,500. We thought a moment and then we decided that we would take it. It was above our price, but with no excavation to speak of and it being solid. . . ." Again, "We told them we only had so much money to spend and inasmuch as we could save on excavation and it being a solid lot, that we could cut down on the house and take the lot, and we gave them $500 and bought the lot at that time." Plaintiffs were intending to build an adobe home and so told defendants, showing them a sketch of same. Plaintiff said, "that one of the things that some of the people I had talked to said was that it was very necessary to have a good solid lot to put the house on because it was very heavy. He assured me that I had no worry on that lot because it was solid in front." This was the first qualification of the flat representation that the lot had no fill in it. It was followed by the further statement: " 'Back here in the wing, in the back, there is about two feet of fill, but you won't have to worry about that because your building site is up here and your house will fit in the front part of the lot and it will be fine for you.' " Mrs. Ashburn testified that they discussed the heavy construction of an adobe house and Miller said, "that it was a solid lot, no fill in the front, and we would have practically no excavation. So he said everything would work out all right." Defendant also told plaintiffs he was a hauler of dirt, had a fleet of trucks and hauled dirt. The result of all this, as expressed by plaintiff-husband, was: "We liked them both very much and we believed—we took their word for everything they said because they seemed like such nice people at that time." Defendant had a printed form of contract which he filled in. The parties signed it and plaintiffs paid $500 on account of the purchase price at that time.

About a week later plaintiff took his mother, Mrs. Aschenbrener, to see the lot and they were invited into the Miller home. The mother testified to the conversation with defendant as follows: "I told them that I thought the lot was a beauti-

ful lot but I thought the price was out of line. Of course, I was accustomed to Wisconsin prices. He assured me it was a good lot, a lot ready to build, not filled, and consequently the price was right. And I didn't know what fill meant. I didn't know what solid lots meant because in our country we just don't have those. They explained to me what it was all about and convinced me that the price was probably right." Plaintiffs each testified substantially to the same effect.

About two weeks after the contract was signed plaintiff took to the lot Mr. William Mellenthin, a building contractor of 33 years' experience, whom he expected to construct his house. There they met defendant. In his presence Mellenthin told plaintiff the lot had all the earmarks of having a fill in it, whereupon defendant said: " 'This is one lot that was solid up there.' Mellenthin said, 'How can you be sure on that?' Miller said, 'Well, I owned the lot. I ought to know.' Mr. Mellenthin said, "Well, then if you owned it I suppose you do know.' " Nevertheless, Mellenthin remarked that test holes should be made. Miller reiterated that there was no fill. However, Mr. Ashburn did not hear the remark about test holes for he was not present when it was said. Later, when Mrs. Ashburn asked defendant about test holes he replied: " 'If you want to waste $200 to dig test holes, take the $200 and hire Chabot and he'll fix the lot.' "

Mr. Arthur L. Glasscock, a neighbor of plaintiff, testified that plaintiff introduced him to defendant about April, 1955, when they were on or near the lot in question. "I heard Mr. Miller make a statement to Mr. Ashburn that it was a solid lot and ready to build on, and that he should have his home completed within three months." Also, "Mr. Miller said to myself or to myself and Mr. Ashburn that it was a good price, but that you couldn't buy lots in the hills ready to build on for any less; cheaper lots would have an expensive excavating charge connected with them." Also that the lot was ready to build on and was solid ground. No mention was made of any fill.

Plaintiff took Mr. Harry W. Keas to see the lot in March, 1955; he is an experienced building contractor. He told plaintiff there was some evidence of fill. On the same occasion Keas "asked him [defendant] what he thought there was to the fact that the lot might be filled. He said there might be a small amount but not very much, and anyhow in my contract, in the clause in there, I was protected. . . . He said possibly if there was any it would be back around where the fruit trees

were. Q. Would that affect the building site in any way? A. No. If it was there it wouldn't affect it.''

When digging cesspools about the middle of April plaintiff gained his first knowledge of the location and extent of the fill. The cesspool was located about 125 feet back from the curb in a lot which was about 177 feet deep on one side and 152 feet on the other. When the hole had reached 6 or 7 feet in depth the workers had not yet struck solid ground. Plaintiff told Miller about it and they dug down at the corners of the prospective Ashburn house, came to a dark layer of soil and defendant said that was natural top soil. ''He said that he knew that this was top soil; that he worked with excavators and he was familiar with this type of soil and that the dark soil was the top soil and that was solid ground.'' Defendant also said that Mr. Chabot could fix the lot to build on by working a half day or a day at most.

About this same time, late April or early May, Miller took plaintiff to see Mr. Howard C. Brown, whose home adjoined the subject lot on the east, and who, according to defendant, had formerly owned it and had lived in the neighborhood for 20 years. Miller had been telling Ashburn that there was only a little bit of fill next to the road. ''Mr. Miller said, 'Brown, do you know of any fill on that lot?', and Brown said, 'As far as I know, I don't know of any fill.' And he says, 'The only fill that I have put on the lot was in the back end of the lot.' . . .That that was way in the rear part of the lot. Q. Mr. Miller asked Mr. Brown whether he knew of any fill on the property? A. He did. Q. And Mr. [Brown] said he didn't know of any fill except the back part of the lot that he put on himself? . . . A. Yes.'' It later developed that the depth of fill was 15 feet where a portion of the house was to go. Mr. Cecil F. Collins, engineer associated with the Warren Company which did certain engineering work pertaining to the compacting of this lot, testified that at a distance of 30 feet from the curb 3 feet of fill was removed; at the back line of the house 10 feet; at the front building line 6 feet; and 15 feet back of the building line 15 feet.

Mr. Keas had made a contract with plaintiff to build the house. Early in June his tractor man, Holmes, diagnosed the land as filled. Keas, who was present, warned plaintiff of probable extra costs and Miller, also there, said that Keas was scared of the thing and he could have Chabot do it in a day or a day and a half and he would have the lot leveled off.

Plaintiff tried to get Chabot to do the job but he was unavailable.

After Gordon D. Firestone had excavated filled material to a depth of 16 or 17 feet plaintiff told defendant " 'Look, Dick, this thing has gotten all out of hand now. I can't stand this kind of expense. I bought this lot with the understanding that it was solid. Here we are running up bills.' I said, 'I can't afford this any more.' He said, 'Harris, I feel very bad. I know you are getting a royal —— on this thing.' Those were the words I think that he used. He said, 'Come on up (and he made a date for either that night or the following night), and Doris and I will talk it over and we will see what we can do about it.' '' At the appointed time plaintiffs went to the Miller home; defendants say that Ashburn was fighting mad; he and his wife offered to give the lot back with the cesspools in it, to pay for the work that had been done, if defendants would restore the $7,500. This was rejected. Plaintiffs then sought an adjustment in the price but without success, Mrs. Miller observing that plaintiffs saw the lot, bought it and were stuck with it. Mr. Miller followed plaintiffs out of the house, promised to talk his wife into making some adjustment and the two men agreed to meet the next day at noon. Defendant did not appear and plaintiff was not able to contact him after that, so he brought suit.

██ That misrepresentation or concealment of the known fact of a fill in a lot sold to another constitutes material inducement which works a fraud upon the buyer who is ignorant of the fact is recognized by the adjudicated cases. See *Clauser* v. *Taylor*, 44 Cal.App.2d 453, 454 [112 P.2d 661]; *Tatham* v. *Pattison*, 112 Cal.App.2d 18, 21 [245 P.2d 668]; *Burkett* v. *J. A. Thompson & Son*, 150 Cal.App.2d 523, 526 [310 P.2d 56]; *Central Mutual Ins. Co.* v. *Schmidt*, 152 Cal.App.2d 671, 673 [313 P.2d 132].

Plaintiff testified that the question of whether or not this lot had a fill on it was very important to him. Defendant's own conversations, as above narrated, show that he also considered absence of fill a material inducement to any sale. Also, his recognition of the importance of the matter is attested by the fact that he took plaintiff and earlier prospects to Brown to receive assurances on the subject. What the parties deem material will be accepted by the courts as such. (Rest., Torts, § 538, p. 86; Prosser on Torts (2d ed.), p. 555.)

██ Appellants say that plaintiffs were not justified in relying upon defendants' misrepresentations because they

made their own investigation and thereby precluded themselves from further placing credence in defendants' statements. The argument overlooks or ignores important considerations.

The so-called investigation is the visit of Mellenthin to the lot and his assertion that the property bore all the earmarks of a fill. This occurred about two weeks after plaintiffs signed a contract to purchase; before that time they had no intimation of the fact of any fill except the small one that Brown later spoke about. Being bound by written contract to buy, later information of falsity of its inducements could not alter their legal rights unless they waived the fraud in some manner, and this they did not do.[2] The escrow instructions did not make a new contract; they were merely the vehicle for carrying out the one which the parties had already signed. (*King* v. *Stanley*, 32 Cal.2d 584, 589 [197 P.2d 321] ; *Katemis* v. *Westerlind*, 120 Cal.App.2d 537, 542 [261 P.2d 553] ; 18 Cal.Jur.2d § 29, p. 351.) Appellants' cited cases (*Elko Mfg. Co.* v. *Brinkmeyer*, 216 Cal. 658 [15 P.2d 751] ; *Cameron* v. *Cameron*, 88 Cal.App.2d 585-594 [199 P.2d 443] ; *Neet* v. *Holmes*, 25 Cal. 2d 447 [154 P.2d 854]) are not in point.

When Mellenthin suggested the possibility of a fill, Ashburn, believing defendant's statements and echoing them, said there was none, and Miller immediately said the same thing, adding that he ought to know because he owned the lot. The Ashburns believed defendant implicitly. Mellenthin's suggestion of test holes was not followed because plaintiffs trusted defendant completely. It does not lie in his mouth to say that plaintiffs should not have done so. ''As a general rule negligence of the plaintiff is no defense to an intentional tort. (See Prosser, Torts, 402.) The fact that an investigation would have revealed the falsity of the misrepresentation will not alone bar his recovery (Rest., Torts, § 540; see cases cited in 12 Cal.Jur. 758, 759). . . . Nor is a plaintiff held to the standard of precaution or of minimum knowledge of a hypothetical, reasonable man. Exceptionally gullible or ignorant people have been permitted to recover from defendants who took advantage of them in circumstances where persons of normal intelligence would not have been misled. (See cases cited in 6 Cal.Jur. Supp. 45 (note 13) ; Prosser, Torts, 749.) 'No rogue should

---

[2] The delay from January 7 to March 18, in opening the escrow, is explained by the fact that plaintiffs had their home up for sale and were actually paying defendants the sum of $25 a month during the period of delay.

enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool.' (*Chamberlin* v. *Fuller,* 59 Vt. 247 [9 A. 832, 835].)'' (*Seeger* v. *Odell,* 18 Cal.2d 409, 414, 415 [115 P.2d 977, 136 A.L.R. 1291].) '' 'Where one is justified in relying, and in fact does rely, upon false representations, his right of action is not destroyed because means of knowledge were open to him. In such a case no duty rests upon him to employ such means of knowledge. . . . It is said not to be just that a man who deceives another should be permitted to say to him, ''You ought not to believe or trust me,'' or ''You are yourself guilty of negligence.'' ' (12 Cal.Jur., § 34, p. 758.)'' (*United States Nat. Bank.* v. *Stiller,* 216 Cal. 324, 333 [14 P.2d 78].) See also *Hefferan* v. *Freebairn,* 34 Cal.2d 715, 719 [214 P.2d 386, 607].

When Mrs. Ashburn later asked Miller about test holes he told her it would be a waste of money. ▪ A defendant who prevents an investigation or directly or indirectly induces his buyer to refrain from making one, cannot have the benefit of the results which would have followed a thorough investigation if actually made. ▪ ''Where positive statements regarding the value of property are made by the owner as facts and not as mere expressions of opinion, and his acts or conduct result in dissuading the purchaser from making an independent investigation respecting the value, the owner is estopped from relying upon a lack of independent inquiry as a defense in an action for rescission on the ground of fraud.'' (*Vah Dah Dunshee* v. *Broadway,* 119 Cal.App. 678, 686 [7 P.2d 325].) ''Another answer is that there was substantial evidence that Sime was dissuaded from pursuing the investigation and prosecuting his cross-complaint by the very frauds which the defendants claim he should have uncovered. . . . It is well settled that one who has acted in a manner which would reasonably induce another to forego or discontinue an investigation of his fraudulent acts will not be heard to say that the facts would have been developed had inquiry been made.'' (*Sime* v. *Malouf,* 95 Cal.App.2d 82, 107, 108 [212 P.2d 946, 213 P.2d 788].) See also 23 Cal. Jur.2d § 38, p. 93. The investigation argument falls of its own weight.

▪ *Re* damages. The claim that the finding of the amount of damages to be $3,000 is without support in the evidence also proves to be without merit. After the trial judge had decided for plaintiffs, but before he signed any findings, he concluded that he had erred in fixing the amount of damage, re-

appraised the same and awarded judgment for $3,000, which was carried into the findings and judgment. Appellants, relying upon section 3343, Civil Code,[3] as the exclusive measure of damages in a vendor-vendee fraud case (*Bagdasarian* v. *Gragnon,* 31 Cal.2d 744, 759-762 [192 P.2d 935]; *Gagne* v. *Bertran,* 43 Cal.2d 481, 490 [275 P.2d 15]; *Central Mutual Ins. Co.* v. *Schmidt, supra,* 152 Cal.App.2d 671, 676), argue that there is no evidence that the property was worth less than the amount paid for it.

Defendants' only expert fixed the value of the filled lot on the date of sale at $8,000 to $9,000, and further said that if there had been no fill it would have been worth $11,500 to $12,500,—a difference of $3,500.

Plaintiff produced one expert, Mr. Ted Hekt, a broker of 10 years' experience who had specialized in hillside property in the area including the subject lot. On direct examination he pursued the theme that a filled lot would be worth only half of the owner's asking price, whatever that figure might be. He also said he knew of filled lots in the area priced from $1,000 to $5,000, but he fixed no specific value on this particular lot. However, on cross-examination he testified: "Q. By Mr. Conroy: What in your opinion would be the value of that lot compacted as it is now as of January 7, 1955? I think that is the question. A. Compacted as it is now on January 7, 1955? That is better than a year ago. With the dropoff, with the lack of vegetation in that area, $4,000 would be a fair price. Q. $4,000? A. I think so. That is a high price. That is a good price." On redirect: "Q. I am not sure I asked you what the valuation of this property would have been as filled property, not compacted, but filled, as of January 7, 1955. A. It would be the same, counsellor. Q. It would be the same? A. It would be the same. Q. There hasn't been any appreciable change in value to your knowledge? A. Not to my knowledge." The effect of this testimony is that the filled lot, with or without compaction, was worth $4,000 on the date of sale, $3,500 less than the price paid. The witness emphasized that he was talking about market value as distinguished from asking prices, and he gave examples of recent sales. It does not appear that his valuation was based prin-

[3]Civ. Code, § 3343. "One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction. . . ."

cipally or largely on asking prices. The ultimate thought seems to have been that a filled lot is a filled lot, and compaction of the fill does not change the picture in the eyes of prospective purchasers. ''I would say this: Due to compaction, if you sell a lot with this amount of fill you are apt to get a downslope; you are apt to get a fall-off, which has occurred in this case, that would give a great resistance value for a potential resale. . . . Q. If there were, for instance, 10 prospects on this particular piece of property to buy it at some future date, out of the 10 prospects how many in your experience would shy away, if they would, if they knew the property had been compacted? . . . Q. I asked you a question, whether out of 10 people in your experience—— A. They would ask questions. Nine of them would probably ask why and walk away from the property today. Q. In opposition to—— A. In opposition to the flat level lot, yes. Q. Or in opposition to the compacting, or just the shape, or the levelness of the lot, or which? A. Most buyers do not know what compaction means unless they have seen it. They would ask me what the cracks in the ground mean and in all honesty I would have to explain it, that it was due to compaction. Q. Did you see cracks in the ground on Sunday when you were up there? A. Oh, yes.'' The witness admitted that compacted lots are selling in the Hollywood Hills and Doheny Estates areas, but he was voicing the views of those who believe that a filled lot does not appeal to the ordinary buyer, who knows little, if anything, about the process or effect of compaction and is not interested in buying any kind of filled lot.[4]

The witness, Cecil F. Collins, soil engineer, though enlarging upon the engineer's view that compacted fills are better bearing soils than solid natural earth, said: ''There is a continuing process of education regarding fills. The word 'fill' has been a dirty word in construction for a hundred years and, as I say, in the last 25 years it has become controlled. It is perfectly satisfactory, but there is some resistance among the hard-to-change group.''

The inferences to be deduced from the evidence are for the trial judge, if reasonable, and we see no error in his accept-

---

[4]This evidence would sustain a judgment for $3,500. Error, if any, in fixing the amount at $3,000 was in favor of defendants and hence not ground for complaint. (See *Dutra* v. *Cabral*, 80 Cal.App.2d 114, 118 [181 P.2d 26]; *Employees' Participating Assn.* v. *Pine*, 91 Cal.App.2d 299, 302-303 [204 P.2d 965]; *Union Hollywood W. Co.* v. *Los Angeles*, 184 Cal. 535, 539 [195 P. 55]; 15 Cal.Jur.2d, § 233, p. 47.)

ing Hekt's view that there is so much resistance of buyers toward filled lots that the known fact of fill adversely and substantially affects the market price or value. This attitude seems not without foundation in other portions of this record.

Originally, Mellenthin was going to build the residence for plaintiffs, but when he suspected the lot was filled, notwithstanding Miller's and Ashburn's assurances to the contrary, declined the job of constructing an adobe house on such suspected foundation.[5] He testified: "I am a little biased. I don't like fill of any kind, whether it's compression or not. I built lots of houses on compression lots. It took me a long time before I was sold on any kind of compression." Mr. Keas, building contractor of 30 years' experience, after visiting the property and being told by defendant that there might be a small amount of fill around the fruit trees which did not affect the building site, made a contract with plaintiff to construct the residence; but he persuaded plaintiff to release him from his contract when he discovered the extent of fill, saying he had no faith in a compacted lot. "It had been my experience for many years that a compacted lot was not as good as natural soil, and you put heavy weight on there, especially where he could not get his compaction clear out to his property line, and a wall would have to be built on the cleavage between the property that was not compacted and the property that was compacted, and I just didn't have any faith in it and I just didn't want to build on it." Also, "Q. In that connection, let me ask you this: You have built on many filled lots, haven't you, on compacted lots? A. I have built on several and I have never found one satisfactory yet. . . . A. I am of the opinion on any slope where soil is compacted it still is subject to slippage and the falling away, no matter how much they compact it, and regardless of what any engineer says, it has been my experience that it will do so."

There is solid basis for the rule of the above cited cases (*Clauser* v. *Taylor, supra,* 44 Cal.App.2d 453; *Tatham* v. *Pattison, supra,* 112 Cal.App.2d 18; *Burkett* v. *J. A. Thompson & Son, supra,* 150 Cal.App.2d 523; *Central Mutual Ins. Co.* v. *Schmidt, supra,* 152 Cal.App.2d 671) that disclosure of the fact of a fill is obligatory upon a seller who knows of same; that is because it affects the value in the eyes of the ordinary buyer; at least, that was a reasonable inference for the trial judge to draw at bar.

[5]Later, when adobe was abandoned in favor of lighter construction, Mellenthin did erect plaintiff's residence.

 The court found that defendant had actual knowledge "that in truth and in fact the greater portion of the said land, and especially the area fronting upon said Torreyson Drive, contained loose earth and uncompacted fill." The evidence does not support this finding of actual knowledge, but it does establish "the positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true." (Civ. Code, § 1572, subd. 2.) It shows without contradiction that no fill had been placed on the land since 1937 or 1938 when Mr. Brown bought the property except the small amount, 1 to 3 feet, that he put on the north or rear end about that time. As a witness he shrewdly guessed that the fill found by plaintiff had been done as a part of the original subdividing. Prior to plaintiffs' purchase defendant had taken three or four prospective buyers to Brown to ask about fill and they had been told that he had put a maximum of approximately three feet on the lot and had no knowledge of any other. While defendant's conduct after plaintiff's discovery of the extensive fill gives rise to a suspicion that he had actual knowledge, it does not amount to substantial evidence of the fact. On the other hand, it is clear that defendant unequivocally and repeatedly assured plaintiffs and others brought to the property by them that there was no fill on the front part of the lot or in the building site. Mr. Ashburn testified: "He never said as far as he knew there was no fill on the lot." Mrs. Ashburn: "When we went up there after we found the fill in the cesspools, I was sick when my husband came back and told me about it. We went up to his place several times and he always said he knew there was no fill on the building site; that that little bit would mean nothing because we had to dig anyhow up in the corner where we found the 3½ feet of fill; that we had to cut that down because that was a hillside. He said, 'I don't know what you are worried about,' and he always reassured us that there was no fill." The inference is also inescapable that defendant did not have any information which warranted such positive assertions. That spells fraud. Volume 23, California Jurisprudence 2d, section 27, page 66: "Actual fraud according to the Civil Code is committed where, with intent to induce another to act in reliance thereon, a person makes a positive assertion, in a manner not warranted by his information, of that which is not true, though he believes it to be true. If, therefore, one asserts that a thing is true within his personal

knowledge, or makes a statement as to his own knowledge, or makes such an absolute, unqualified, and positive statement as implies knowledge on his part, when in fact he has no knowledge of whether his assertion is true or false, and his statement proves to be false, he is as culpable as if he had wilfully asserted that to be true which he knew to be false, and is equally guilty of fraud. This is the rule even though the one making the assertion believes it to be true, unless it appears that such belief is based on reasonable grounds.'' ■ Intent to defraud is not of the essence of a suit for deceit; it is intent to induce action by the other party that counts. (*Gagne* v. *Bertran, supra,* 43 Cal.2d 481, 488, footnote 5.)

We have not overlooked the denials of defendants or the other testimony favorable to their side of the case. We are not free to weigh the evidence or to accept that favorable to appellants which is opposed to the proof presented by respondents.

Paragraph I of the findings of fact is amended to read: ''That all of the allegations contained in Paragraphs I, II, III, IV, V, VI, VII, IX, X, XI, XII, XIII and XV of plaintiffs' complaint are true, with the exception that with reference to Paragraph III the date of March 18, 1955, and all other references to said date contained in plaintiffs' subsequent allegations should be and is January 7, 1955. It is also true that said representations were made as positive assertions of fact and that same were not warranted by the information possessed by defendants or either of them.''

The judgment is affirmed.

Fox, P. J., and Herndon, J., concurred.