[Civ. No. 50631. First Dist., Div. Two. June 29, 1982.]

PAUL BARNHOUSE et al., Plaintiffs and Appellants, v.
CITY OF PINOLE et al., Defendants and Respondents.

174

Stephen J. Kennedy and Donald W. Curran for Plaintiffs and Appellants.

Raymond J. Bergez, Hardin, Cook, Loper, Engel & Bergez, Richard G. Rypinski, Lee Tyler, Robert J. DeFea, Thomas C. Nagle, Robert R. Buell, James Martin, Hancock, Rothert & Bunshoft, Harlow P. Rothert and Eliassen, Postel & Mee for Defendants and Respondents.

James P. Watson and Cox, Castle & Nicholson as Amici Curiae on behalf of Defendants and Respondents.

**OPINION**

**GRODIN, P. J.**—This appeal arises out of an action for damages to real property and personal injuries resulting from soil subsidence. Appellants, plaintiffs below, are owners of single family residences located on Sarah Drive in Pinole. Respondents, defendants below, are: Earl W. Smith, Earl W. Smith Developers, Ltd., and Earl W. Smith Development Organization (hereafter collectively Smith), the developers of appellants' lots and builder of their homes; and the City of Pinole (City) and the State Department of Transportation (State), the owners of public streets, highways and associated drainage systems which drained storm waters into a ditch onto property owned by Pacific Gas and Electric Company (PG&E) and bordering appellants' lots to the north. Various of appellants' theories were eliminated through demurrer, dismissal, or nonsuit, and the one theory which went to the jury—against the government respondents for inverse condemnation—resulted in a defense verdict.

### Statement of Facts

In 1956, the State built an east-west freeway through unimproved land north of what later became appellants' property. The plans called for relocation of a natural stream bed onto PG&E's property immediately to the south, and for culverts to carry storm water from the freeway into the stream bed.

In 1959, Smith prepared to develop the property immediately to the south of the PG&E right-of-way. Soils engineers retained by Smith found springs and slides on the proposed subdivision site, to the north of what would become the Barnhouse, Carrillo, and Dempster lots, and recommended that a permanent drain be installed. There is a factual dispute as to whether this recommendation was implemented.

Civil engineers retained by Smith designed the subdivision. Their design placed the lots sloping downhill from west to east parallel to the freeway, with backyards facing north and the front of the houses facing south onto Sarah Drive. In the course of grading operations, soils engineers discovered "active seepage zones" opposite one of the lots. The civil engineers designed a storm drain to pick up most of the surface waters, fed by a catch basin located between lots 8 and 9, and emptying into the relocated stream on the PG&E right-of-way.

Upon completion of the subdivision, the City approved the improvements and accepted the storm drain system. The civil engineers certified to the Federal Housing Authority that the subdivision had been constructed in conformance with the approved plans, and the soils engineers similarly gave their approval.

In 1961, appellants Mr. and Mrs. Barnhouse, Mr. and Mrs. Carrillo, and Mrs. Dempster (then Mrs. Stearns) purchased their homes from Smith. They were advised that the houses were on fill, but they were not advised of the preexisting slides and springs. All testified they would not have bought their homes had they been so advised.

In February 1962, a slide began at the bottom of the hill behind the Barnhouse and Carrillo lots. These appellants notified the City, which in turn notified the State and Smith. Experts for Smith and the governmental bodies each placed the blame on the other. There was evidence from which the jury could have found that the 1962 slide was caused by Smith, the State and City, all three, or none of them.

In July 1963, Smith prepared a written agreement for the signatures of the Carrillos and the Barnhouses which provided for their assignment to him of their existing causes of action against the State arising out of the 1962 slide, and in which Smith agreed to do the following: "A) At its sole expense cause such work to be performed as shall be necessary to stabilize the slide area and to compact the earth which moved. B) Do such preventative work as such be recommended by [Smith's soil engineers] so as to prevent future slides from occurring." Smith's agent, William Peloyan, personally delivered the proposed agreements to the Barnhouses, and told them that Smith "would do the work, fix it, and [there] would be . . . no problem anymore with it." The Barnhouses and Mr. Carrillo consulted the city attorney, who advised them to sign the agreement, and they did. Peloyan then signed the agreements on behalf of Smith, and sent duplicate originals to the Barnhouses and the

Carrillos on August 2, 1963, with a cover letter stating that Smith's engineers and soils engineers were working on details of the proposed preventative work, and that bids would be obtained and work would commence within a few weeks.

On August 13, 1963, Smith's civil engineers submitted a plan, which was approved by Smith's soils engineers, calling for permanent repair of the slide through removal of the slide mass, installation of a drain blanket, reconstruction of the slope, and installation of a pipe leading from the State culvert and tying into a closed culvert to be installed at the bottom of the ditch. The civil engineers estimated the cost of repair would be $10,260, but the lowest bid came in at $25,830. In September the soils engineers, noting the expense involved and the unresolved question of reimbursement from the State, submitted a revised recommendation for a "temporary measure" through excavation of the toe material and installation of a buttress and diverter plate, measures which, he stated, would "not restore the original contours or stability to the area," but would be only an "interim protective measure." Smith delivered a copy of the new plan to the city attorney, identifying it as "first aid maintenance," "an interim measure," and "not the final solution."

In September and October 1963, Smith proceeded to make a repair conforming to neither of the above plans. The cost of the actual repair was less than one quarter of that contemplated under the lowest bid for the "permanent" repair. The parties dispute the materiality of the changes, but it is clear that neither the City nor Smith informed the appellants of any deviation from the "permanent" repair plan.

In 1964, Smith filed suit against the State, alleging that the State was responsible for "severe slide damage" to property at 1699 and 1709 Sarah Drive "commencing with the winter of 1961-1962, and continuing to the present time." In response to interrogatories from the State, Smith admitted, "[I]t is possible that there may be future damage to the subject property as a result of the condition of defendants' property." None of the appellants was informed of the possibility of future damage. The suit was not brought to trial, and it was ultimately dismissed with prejudice.

In the spring of 1974 slides returned. The northwest corner of the Carrillos' backyard collapsed, a crack in the hill progressed toward the Barnhouse home, the rear section of their patio collapsed, and hairline cracks appeared in the concrete block wall around the Dempster's back-

yard. Appellant Self, who bought a house in 1971 as a rental, became aware of a bulge in the top of the wooden retaining wall and noticed that a tree in his backyard was leaning downhill toward the creek. He also became aware of water accumulating on the left side of his house.

On December 6, 1974, the Barnhouses, the Carrillos and the Dempsters along with other plaintiffs filed suit against the State, the City and PG&E. During mid-1975, they learned for the first time that Smith had not made the repairs recommended by his soils and civil engineers, and served Smith as a Doe defendant. Thereafter, Self and another couple who had purchased houses in the subdivision, the Swansons, filed similar suits, and in August 1977, the three actions were consolidated for trial. Some of the plaintiffs settled after judgment.

The Barnhouses, the Carrillos, the Dempsters, and Self have appealed from the judgments in favor of Smith and the government respondents. They contend that the trial court erred (1) in holding their breach of contract and warranty claims against Smith to be barred by the 10-year statute of limitations applicable to construction projects (Code Civ. Proc., § 337.15); (2) in granting Smith's motion for nonsuit after presentation of appellants' case on theories of willful misconduct and fraudulent concealment; (3) in eliminating certain of appellants' theories against the City and the State through pretrial order; (4) in eliminating appellants' nuisance theory against the City and State at the close of appellants' case; and (5) in instructing the jury on inverse condemnation. They also contend (6) that the jury's defense verdict was not supported by substantial evidence. We will consider each of these contentions in turn.

I.

*Was appellants' action against Smith for breach of contract and breach of warranty properly dismissed under Code of Civil Procedure section 337.15?*

Section 337.15 of the Code of Civil Procedure,[1] quoted in full at the margin,[2] is a 10-year statute of limitations barring damage actions

---

[1]Hereafter all code references are to the Code of Civil Procedure unless otherwise indicated.

[2]In 1974 section 337.15 provided:

"(a) No action may be brought to recover damages from any person who develops real property or performs or furnishes the design, specifications, surveying, planning, supervision, testing, or observation of construction or construction of an improvement

against developers of real property brought for latent deficiencies or property damage. Subdivision (e) denies protection of the statute to "any person in actual possession or . . . control [of such an improvement], as owner, tenant or otherwise," Subdivision (f) exempts actions based on "willful misconduct or fraudulent concealment."

Based on this statute, the trial court sustained Smith's demurrer to the complaints without leave to amend, except insofar as the complaints sought recovery based on fraudulent concealment or wilful misconduct. Appellants contend that the statute is unconstitutional on equal protection and due process grounds, and that it in any event should not be interpreted to apply to their dismissed counts.

A. *Constitutionality of section 337.15.*

1. *Equal Protection.* Appellants challenge the constitutionality of section 337.15 under the equal protection clause of the Fourteenth Amendment to the federal Constitution, and under article I, section 7 of the California Constitution.

In *Regents of University of California* v. *Hartford Acc. & Indem. Co.* (1978) 21 Cal.3d 624 [147 Cal.Rptr. 486, 581 P.2d 197], the Supreme Court held that sureties are excluded from the protection of

---

to real property more than 10 years after the substantial completion of such development or improvement for any of the following:

"(1) Any latent deficiency in the design, specification, surveying, planning, supervision, or observation of construction or construction of an improvement to, or survey of, real property.

"(2) Injury to property, real or personal, arising out of any such latent deficiency.

"(b) As used in this section, 'latent deficiency' means a deficiency which is not apparent by reasonable inspection.

"(c) As used in this section, 'action' includes an action for indemnity brought against a person arising out of his performance or furnishing of services or materials referred to in this section, except that a cross-complaint for indemnity may be filed pursuant to Section 442 in an action which has been brought within the time period set forth in subdivision (a) of this section.

"(d) Nothing in this section shall be construed as extending the period prescribed by the laws of this state for bringing any action.

"(e) The limitation prescribed by this section shall not be asserted by way of defense by any person in actual possession or the control, as owner, tenant or otherwise, of such an improvement, at the time any deficiency in such improvement constitutes the proximate cause for which it is proposed to bring an action.

"(f) This section shall not apply to actions based on willful misconduct or fraudulent concealment."

The section was amended in 1979, 1980, and again in 1981, but the amendments are not relevant or applicable to the issues in this case.

section 337.15,[3] and it rejected an equal protection argument leveled against that interpretation, in language which provides a basis for analysis of appellants' claim: "Defendant surety contends that section 337.15, if interpreted to exclude sureties, denies it the equal protection of the laws. We encounter no difficulty in finding a rational basis for the legislative classification distinguishing contractors and sureties. A contractor is in the business of constructing improvements and must devote his capital to that end; the need to provide reserves against an uncertain liability extending indefinitely into the future could seriously impinge upon the conduct of his enterprise. The construction surety, on the other hand, is in the business of assuming and evaluating risks derived from construction projects; it has the ability to spread such risks among the many contractors whose performance it guarantees, and to adjust its rates to assure that the substandard performance of any individual contractor will not prove disasterous. The legislative classification thus rests upon '". . . some ground of difference having a fair and substantial relation to the object of the legislation . . .'" [citations], and is thus constitutional." (*Id.*, at p. 633, fn. 2.)

In *Eden* v. *Van Tine* (1978) 83 Cal.App.3d 879, 886 [148 Cal.Rptr. 215], the court relied upon the *Regents* analysis to reject a claim, identical to that which appellants make here, based upon the exclusion of owners, tenants, and others in possession. Quoting from *Regents'* description of the problems confronting a contractor, the court stated: "There is a reason for treating persons in possession differently from the contractor and architect. . . . [O]ne who owns the property or controls it at the time of the accident (i.e., at the time the defect constitutes the proximate cause of the damage or injury) is likely to have insurance."

The Supreme Court of Pennsylvania, upholding that state's 12-year statute of limitations against the same attack, relied upon the broader scope of liability imposed upon the class of builders as opposed to the class of owners: "First, the class of persons to whom builders may be liable is larger than the class to which owners may be liable. . . . Second, a builder may be liable for construction defects under various legal theories—contract, warranty, negligence, and perhaps strict liability in tort. Landowner liability for such defects, on the other hand, typically lies only in tort, unless the landowner is a lessor, in which case he is liable only for events occurring while the tenant is in possession. . . . Third, landowners can ordinarily avoid liability by taking adequate care

---

[3]Section 337.15 was amended in 1979 to protect sureties. (Stats. 1979, ch. 571, § 1, p. 1797.)

of their land and structures .... The builder has no such control over his product after relinquishing it to the landowner.... For any of these reasons the Legislature might rationally conclude that builders should remain liable for their mistakes for only 12 years after they complete construction, but that a landowner should remain liable for injuries caused on his land for as long as he is in possession." (*Freezer Storage, Inc.* v. *Armstrong Cork Co.* (1978) 476 Pa. 270 [382 A.2d 715, 718-719]; see also *Harmon* v. *Angus R. Jessup Associates, Inc.* (Tenn. 1981) 619 S.W.2d 522.)

█ Allowing for some differences between Pennsylvania and California law, this analysis appears sound. For the reasons stated in the Pennsylvania opinion, as well as in the *Van Tine* opinion, we conclude that the statute does not offend the equal protection clause by excluding owners from its protection.

California courts have not had occasion to confront squarely the constitutionality of the apparent exclusion of suppliers and materialmen from the scope of section 337.15, but in *Wagner* v. *State of California* (1978) 86 Cal.App.3d 922 [150 Cal.Rptr. 489], the court rejected a similar constitutional attack upon section 337.1, which establishes a four-year statute in favor of architects and contractors, based upon the contention that it discriminated in favor of those persons associated with construction and improvements to real property, while not conferring the same benefits on persons associated with personal property. The court stated that the four-year limitation period "can be said to promote ... construction, since it frees those associated with it from the specter of lawsuits in the distant future. Those who fear venturing into such activities will be less deterred when a ceiling is placed on the period for which they can be held liable. The concept of promoting construction tends to harmonize with the public policy favoring the full enjoyment and use of real property. [Citations.]" (*Id.*, at pp. 929-930; accord, *Salinero* v. *Pon* (1981) 124 Cal.App.3d 120, 129 [177 Cal.Rptr. 204].)

Recent decisions from other jurisdictions also uphold similar statutes against equal protection attack based on the exclusion of materialmen or suppliers. In *Freezer Storage, Inc.* v. *Armstrong Cork Co., supra,* 382 A.2d 715, the Pennsylvania Supreme Court observed: "Suppliers, who typically produce items by the thousands, can easily maintain high quality-control standards in the controlled environment of the factory. A builder, on the other hand, can pre-test his designs and construction

only in limited ways—actual use in the years following construction is their only real test. Further, every building is unique and far more complex than any of its component parts. Even in the most uniform-looking suburban subdivision, each house stands on a separate plot of land; each lot may have slightly different soil conditions; one may be near an underground stream; and so forth. The Legislature can rationally conclude that the conditions under which builders work are sufficiently difficult that limitations should be placed on their liabilities, but not on the liabilities of suppliers." (*Id.*, at p. 719; accord, *Howell* v. *Burk* (App. 1977) 90 N.M. 688 [568 P.2d 214, 220], cert. den. 91 N.M. 3 [569 P.2d 413]; *Burmaster* v. *Gravity Drainage Dist. No. 2* (La. 1978) 366 So.2d 1381, 1385-1386; contra: *Kallas Millwork Corporation* v. *Square D Co.* (1975) 66 Wis.2d 382 [225 N.W.2d 454]; *Harmon* v. *Angus R. Jessup Associates, Inc., supra,* 619 S.W.2d 522; *Cudahy Co.* v. *Ragnar Benson, Inc.* (D.Colo. 1981) 514 F.Supp. 1212, 1217.)

■ We are persuaded by these authorities that there is a rational basis for the distinction of materialmen and suppliers, as well as owners, and that these classifications do not violate the equal protection guarantees of the federal or state Constitutions.[4]

---

[4]Appellants in their reply brief suggest for the first time that section 337.15 is irrational because it bars actions for latent but not patent deficiencies, and because it assertedly bars actions for property damage but not for personal injuries. We observe that the California Supreme Court has granted hearing in a case involving the application of section 337.15 to personal injuries. (*Martinez* v. *Traubner*, L.A. 31571, hg. granted May 6, 1982.) In *Martinez*, the second district held that section 337.15 is applicable to personal injury actions. This district, however, has held that it is not. (*Grimmer* v. *Harbor Towers* (1982) ante p. 88 [183 Cal.Rptr. 634].) We are not obliged to consider points raised in the reply brief for the first time (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 442, p. 4405.) In any event, these points are without merit.

The equal protection clause is not an authorization for the courts to second-guess the Legislature on the best way to deal with aspects of a problem. It protects classes of people from arbitrary discrimination. The Legislature is entitled to "recognize 'degrees of evil,' and deal with the more important ones. [Citations.] .. [¶] Nor is it necessary that the legislation directly benefit the entire public. It may be deemed of ultimate public benefit even though a particular class is more directly aided. . . ." (5 Witkin, Summary of Cal. Law (8th ed. 1974) Constitutional Law, § 342, pp. 3637-3638; see also *Williamson* v. *Lee Optical Co.* (1955) 348 U.S. 483 [99 L.Ed. 563, 75 S.Ct. 461].)

It is entirely reasonable for the Legislature to determine (1) that the public policy favoring compensation for personal injuries is stronger than that favoring compensation for property damage and (2) that plaintiffs do not need as long a period of time to bring suit for deficiencies which are apparent by reasonable inspection. Patent deficiencies are likely to be discovered long before 10 years from substantial completion. Section 337.1 gives plaintiffs four years from substantial completion to file suit for patent deficiencies, unless the damage is to an owner-occupied single-unit residence in which case plaintiffs have three years pursuant to section 338, subdivision 2. (*Avner* v. *Longridge Estates* (1969) 272 Cal.App.2d 607, 615 [77 Cal.Rptr. 633].) This differ-

2. *Due Process.* Appellants next contend that the application of the 10-year statute to bar their claims would deprive them of due process of law. They rely upon *Rosefield Packing Co.* v. *Superior Court* (1935) 4 Cal.2d 120 [47 P.2d 716], and *Eden* v. *Van Tine, supra,* 83 Cal.App.3d 879.

*Rosefield* involved a statute expressly made retroactive to apply to actions which had already been commenced. After noting that the Legislature may shorten statutes of limitations and make them applicable to pending proceedings, the court stated: "[W]here the change in remedy, as, for example, the shortening of a time limit provision, is made retroactive, there must be a reasonable time permitted for the party affected to avail himself of his remedy before the statute takes effect. If the statute operates immediately to cut off the existing remedy, or within so short a time as to give the party no reasonable opportunity to exercise his remedy, then the retroactive application of it is unconstitutional as to such party. [Citation.]" (4 Cal.2d at pp. 122-123.) The court held that a year was "no doubt" a reasonable time, and noted that "[m]uch shorter periods have been upheld. [Citations.]" (*Id.,* at p. 123.)

*Eden* involved application of section 337.15 to a situation in which construction was substantially completed on February 5, 1963, and plaintiffs discovered damage to their property on December 1, 1972, after the effective date of the statute (which was Mar. 4, 1972), but *before* the 10-year period had run. The court, relying on *Rosefield,* held that section 337.15 would reduce the time for filing suit on their *accrued* cause of action to an unreasonable period of only two months, and that the period of five months in which the action was actually filed was reasonable. (83 Cal.App.3d at p. 887.)

There is a difference between this case and *Eden* however; here, the damage was not discovered until *after* the 10-year period had run, so that no cause of action had accrued within the 10-year period. The application of section 337.15 in such a situation has been upheld against constitutional attack. (*Liptak* v. *Diane Apartments, Inc.* (1980) 109 Cal.App.3d 762, 774 [167 Cal.Rptr. 440].)

We recognize that from the perspective of appellants such a distinction must seem unfair: it was, after all, not their fault that damage did

---

ence is in turn reasonable since plaintiffs living in their own house are likely to notice patent deficiencies sooner, and therefore even if time does not begin to run until discovery, this should not impose any greater burden on contractors than section 337.15 does.

not occur earlier, rather than later. But, as the Supreme Court recognized in *Regents, supra*, 21 Cal.3d at page 641, footnote 13: "[S]ection 337.15 may occasionally effectuate the bar of a plaintiff's remedy before the plaintiff has discovered the latent defect in the property. Such possibility, however, does not differentiate section 337.15 from other, admittedly procedural, statutes of limitation which run from the date of an event instead of the date of discovery"; it appears that *Regents* involved a claim arising out of construction completed prior to the effective date of section 337.15. To accept appellants' argument—that they must be permitted reasonable time from the discovery of the damage to bring their lawsuit—would render the discussion in *Regents* meaningless.

B. *Applicability of section 337.15 to appellants' causes of action.*

Appellants contend that Smith's 1963 agreement for repairs "may be construed as a prospective warranty against future slides," and that no limitation period begins to run until the warranty is breached. In effect, they contend that section 337.15 should not be interpreted to apply to causes of action based upon breach of warranty.

In some states, statutes similar to section 337.15 exclude contract claims from those actions which are barred (e.g., D.C. Code Ann., § 12-310(b)(1) (1973); Mont. Rev. Codes Ann., § 93-2619 (supp. 1977)), or specifically apply only to tort actions (e.g., Okla. Stat. Ann., tit. 12, § 109 (West 1978); R.I. Gen. Laws, § 9-1-29 (supp. 1977)). Section 337.15, however, declares broadly that "[n]o action may be brought" with respect to latent deficiency or injury to property arising therefrom. And in *Regents, supra*, the Supreme Court expressly recognized that, "Section 337.15, read together with Code of Civil Procedure sections 337 and 338, enacts ... a two-step limitation: actions founded upon a latent defect in the development of real property must be filed within three or four years of discovery, *depending on whether the action rests on breach of warranty or negligence*, but in any case within ten years of the date of substantial completion of the improvement." (21 Cal.3d at p. 641, italics added; see also, *Liptak* v. *Diane Apartments, Inc., supra*, 109 Cal.App.3d at p. 769; *Mattingly* v. *Anthony Industries, Inc.* (1980) 109 Cal.App.3d 506, 513 [167 Cal.Rptr. 292].) While room for argument might exist if there were an express warranty for a period of time longer than 10 years, the facts of this case do not pose that question.

Appellants similarly contend that section 337.15 should not be interpreted to apply to their theory that Smith had a continuing duty to warn them of the risks of slide inherent in the project. Except as this contention may involve a claim of fraudulent concealment, expressly exempt from section 337.15, it is subject to the same observations as apply to the contention based on warranty. We conclude that appellants' causes of action based upon warranty and duty to warn are not exempt from section 337.15.

## II.

*Was Smith's motion for nonsuit after presentation of appellants' case on theories of fraudulent concealment and wilful misconduct properly granted?*

■ A nonsuit is properly granted "'only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given.' [Citations.]" (*Estate of Lances* (1932) 216 Cal. 397, 400 [14 P.2d 768]; *Massei* v. *Lettunich* (1967) 248 Cal.App.2d 68, 73 [56 Cal.Rptr. 232].) Thus, we must reverse if we find that there was substantial evidence of either fraudulent concealment or wilful misconduct.

■ Fraudulent concealment may be found where the defendant conceals from the plaintiff a material fact of the subject matter of the transaction that the defendant has a duty to disclose. (1 Miller & Starr, Current Law of Cal. Real Estate (rev.ed. 1977) pt. 1, § 1:77, p. 107; see Civ. Code, § 1710, subd. 3; Civ. Code, § 1572, subd. 3; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 445, p. 2710.) There is a duty of disclosure, inter alia, "when one party to a transaction has sole knowledge or access to material facts and knows that such facts are not known or reasonably discoverable by the other party." (*Goodman* v. *Kennedy* (1976) 18 Cal.3d 335, 347 [134 Cal.Rptr. 375, 556 P.2d 737]; Witkin, *supra*, § 462, p. 2726; see BAJI No. 12.36 (6th ed. 1977).)
■ In the context of real estate transactions, "[i]t is now settled in California that where the seller knows of facts materially affecting the value or desirability of the property ... and also knows that such facts are not known to, or within the reach of the diligent attention and observation of the buyer, the seller is under a duty to disclose them to the

buyer. [Citations.]" (*Lingsch* v. *Savage* (1963) 213 Cal.App.2d 729, 735 [29 Cal.Rptr. 201, 8 A.L.R.3d 537].)

Whether or not the matter not disclosed "is of sufficient materiality to affect the value or desirability of the property ... depends on the facts of the particular case." (*Id.*, at p. 737.) Numerous decisions have found a duty on the part of a subdivider or seller of real estate to disclose to purchasers that the property has a history of underground water or has been filled. (See, e.g., *Herzog* v. *Capital Co.* (1945) 27 Cal.2d 349 [164 P.2d 8]; *Snelson* v. *Ondulando Highlands Corp.* (1970) 5 Cal.App.3d 243 [84 Cal.Rptr. 800, 85 Cal.Rptr. 806]; *Oakes* v. *McCarthy Co.* (1968) 267 Cal.App.2d 231 [73 Cal.Rptr. 127] (dealing also with the issue of punitive damages as provided for in Civ. Code, § 3294); *Massei* v. *Lettunich, supra*, 248 Cal.App.2d 68; *Koch* v. *Williams* (1961) 193 Cal.App.2d 537 [14 Cal.Rptr. 429]; *Buist* v. *C. Dudley DeVelbiss Corp.* (1960) 182 Cal.App.2d 325 [6 Cal.Rptr. 259]; *Rothstein* v. *Janss Investment Corp.* (1941) 45 Cal.App.2d 64 [113 P.2d 465]; *Clauser* v. *Taylor* (1941) 44 Cal.App.2d 453 [112 P.2d 661]; *Grady* v. *Luy* (1931) 117 Cal.App. 292 [3 P.2d 577]; see generally Annot., Fraud Predicated on Vendor's Misrepresentation or Concealment of Danger or Possibility of Flooding or Other Unfavorable Water Conditions (1979) 90 A.L.R.3d 568-640; Annot., Liability of Vendor of Structure for Failure to Disclose That It Was Built on Filled Ground (1961) 80 A.L.R.2d 1453-1456; cf. Annot., Duty of Vendor of Real Estate to Give Purchaser Information as to Termite Infestation (1968) 22 A.L.R.3d 972-993.)

The rationale of these decisions is that such soil conditions are factors, not observable by the purchaser, which, from his or her point of view,[5] materially affect the desirability or value of property. Fill, for example, may require the construction of a "more than ordinary foundation" and, if defective, can cause damage to the improvements. (*Rothstein* v. *Janss Investment Corp., supra*, 45 Cal.App.2d 64, 72-73; Miller & Starr, Current Law of Cal. Real Estate, *supra*, § 1:81, pp. 119-120.) Certification that the fill has been properly compacted does not eliminate the duty of disclosure. (See *Oakes* v. *McCarthy Co., supra*, 267 Cal.App.2d 231, 261-262.) In the words of one court, "a filled lot is a filled lot, and compaction of the fill does not change the picture in the

---

[5](Cf. Rest.2d Torts, § 538, p. 80.) "(2) The matter is material if [¶] (a) a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question ...."

eyes of prospective purchasers.... [A] filled lot does not appeal to the ordinary buyer, who knows little, if anything, about the process or effect of compaction and is not interested in buying any kind of filled lot." (*Ashburn* v. *Miller* (1958) 161 Cal.App.2d 71, 83 [326 P.2d 229].)

■ Appellants here complain of two nondisclosures. While they were informed of the fill, they were not informed of either the preexisting seeps, springs and slides or the deviation from the original plan for the 1963 slide repair. Smith argues that there is no substantial evidence that either is material or was a proximate cause of appellants' damage.

Appellants presented the expert testimony of a soils engineer to support their claims. He testified that special engineering techniques are required prior to developing a tract in an area of a known slide. Pre-existing seeps, springs and slides are an indication that the soil has already lost its strength, and especially where plans call for building homes on fill, which is extremely heavy material yet susceptible to slides itself, absolute removal of the weak soil and installation of special deep drains under the supervision of a soils engineer is essential. The repair of a preexisting slide, which may reoccur, is a complicated structural job, whereas the typical fill is merely a beautification measure.

Appellants' expert testified that the 1962 slide was caused, at least in part, by inadequate structural repair of the preexisting slides, and that the 1974 damage resulted from similarly inadequate structural repair of the 1962 slide. The weight of fill placed on top of weak soil can cause a condition he referred to as "uplift phenomenon" caused by "hydrostatic pressure" and a change in the water table. The weak soil can begin to slide underneath the fill, eventually bringing the fill with it. He observed "sink holes" which can trap water and cause more slides to occur by sheer physical force. These holes, as well as other conditions he observed, indicated to him that the weak soil underneath the fill had not been adequately removed and was in fact sliding. Finally, he testified that when this weak soil is in such a state (which he referred to as "plastic flow"), it can "fill itself up anywhere, even across the street," and it was his opinion that, based on his observations, there was a slide in progress affecting all of appellants' properties. He referred to it as a "chain reaction process" which could involve the "full length of the soil mass."

This testimony is sufficient to support findings that (1) the preexisting seeps, springs and slides materially affected the value or desirability of appellants' property, (2) these conditions were a proximate cause of the damage suffered by appellants, and (3) merely informing appellants that their homes were on filled lots did not give them notice of this independent soil condition.

The fact that Smith may have believed that all of the preexisting slides, seeps and springs had been permanently repaired does no more to ·eliminate a duty of disclosure here than a certification of proper compaction does in the case of fill. (See *Oakes* v. *McCarthy, supra*, 267 Cal.App.2d at pp. 261-262 (FHA and county clearance, far from exonerating subdivision developer, contributed to "lulling the plaintiffs into a sense of security"); *Ashburn* v. *Miller, supra*, 161 Cal.App.2d 71, 83.) ■ In a case such as this one, we believe that the rule announced by the Court of Appeals of Michigan is a sound one: "[W]here a vendor has knowledge of the past or present existence of an instrumentality of progressive destruction or substantial impairment, notwithstanding reason to believe that the progression has been halted, a duty to disclose the circumstances arises." (*Williams* v. *Benson* (1966) 3 Mich.App. 9 [141 N.W.2d 650, 656] (purchasers of motel who had been advised by vendor that there had been termite infestation but that vendor considered trouble had been remedied by treatment had duty to disclose facts to subpurchaser, and silence constituted fraud).[6])

■ Having concluded that the essential elements of materiality and resulting damage were sufficiently supported by evidence, we now consider whether there was substantial evidence of the remaining elements of fraudulent concealment.[7] Smith concedes that he knew of the pre-

[6]Although not necessary to our decision, we note that there was also substantial evidence to support a finding that the deviation from the original plan for the 1963 slide repair was material. Given appellants' expert testimony on the importance and complexity of slide repair, the evidence that appellants Barnhouse and Carrillo were led to believe the repair would be permanent while Smith's agents were indicating to others that it was only temporary, is sufficient to support such a finding. Again, Smith's beliefs are irrelevant. The test is what would affect appellants' decision. (2 Miller & Starr, *supra*, § 11:80.)

[7]"The elements of a cause of action for damages for fraud based on mere nondisclosure and involving no confidential relationship ... appear to be the following: (1) Nondisclosure by the defendant of facts materially affecting the value or desirability of the property; (2) Defendant's knowledge of such facts and of their being unknown to or beyond the reach of the plaintiff; (3) Defendant's intention to induce action by the plaintiff; (4) Inducement of the plaintiff to act by reason of the nondisclosure and (5) Resulting damages. [Citations.]" (*Lingsch* v. *Savage, supra*, 213 Cal.App.2d 729, 738;

existing seeps, springs and slides and made no disclosure to any of the original purchasers. Smith does not appear to dispute the element that the facts in question were beyond the reach of appellants. There was ample evidence that the nature of the soil condition was such that appellants could not have discovered it without expert advice. (See *Buist* v. *C. Dudley DeVelbiss Corp., supra*, 182 Cal.App.2d 325, 331-332.) With regard to the element of the defendant's intent, the jury could have inferred that Smith failed to make the disclosures for the purposes of inducing appellants to purchase their properties in the first place, and discouraging them from taking action subsequent to the 1962 slide. (See *Massei* v. *Lettunich, supra*, 248 Cal.App.2d 68, 73.) Finally, regarding the element of inducement, appellants all testified that they would not have purchased their homes had the disclosure been made. (See *Oakes* v. *McCarthy Co., supra*, 267 Cal.App.2d 231, 244.) We conclude that the requisite evidence exists.

Nor is it necessarily fatal to appellant Self's claim that he purchased his home in 1971 from the original purchaser and did not deal directly with Smith. "'An action for deceit does not require privity of contract.'" (*Lingsch* v. *Savage, supra*, 213 Cal.App.2d 729, 736, quoting from *Nathanson* v. *Murphy* (1955) 132 Cal.App.2d 363, 368 [282 P.2d 174]; but see *Bell* v. *Renaldo* (1975) 51 Cal.App.3d 779, 781-782 [124 Cal.Rptr. 233].[8]) This district has previously quoted with approval the following language from the Restatement: "The maker of a fraudulent misrepresentation is subject to liability . . . to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct . . . ." (Rest.2d Torts, § 533.) "It is not necessary that the maker of the representation 'have any particular person in mind. It is enough that he intends or has reason to expect to have it repeated to a particu-

---

see also 1 Miller & Starr, *supra*, § 1:77, p. 107; Civ. Code, §§ 1572, 1709, 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 445, p. 2711; BAJI No. 12.36 (6th ed. 1977).) The existence of fraud depends upon the particular facts of each case, and it may be inferred from all of the circumstances. (1 Miller & Starr, *supra*, § 1:77, at p. 108; *Koch* v. *Williams, supra*, 193 Cal.App.2d 537, 541.)

[8]In *Bell*, two predecessor grantors of plaintiffs' grantors of land were held not liable to plaintiffs for damages for an affirmative misrepresentation which was in fact repeated by all the grantors because (a) there was no evidence that they knew or intended that their grantees would repeat the misrepresentation to plaintiffs, and (b) the misrepresentation was a personal warranty which did not run with the land.

lar class of persons and that the person relying upon it is one of that class.' (*Id.*, com. g.)" (*Varwig* v. *Anderson-Behel Porsche/Audi, Inc.* (1977) 74 Cal.App.3d 578, 581 [141 Cal.Rptr. 539];[9] see also 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 469, p. 2730.)

Here, the jury could have inferred that Smith failed to make the initial disclosures with the intention that subsequent purchasers would also act in ignorance. (See *Massei* v. *Lettinuch, supra,* 248 Cal.App.2d 68, 73.) It was foreseeable that in a development of relatively inexpensive suburban tract homes, some would change hands. While an affirmative misrepresentation might not be repeated (see *Bell* v. *Renaldo, supra,* 51 Cal.App.3d 779, 781), a nondisclosure must necessarily be passed on. Only Smith knew what his soils engineers had found and it was unlikely that others would find out on their own. It was also possible that resulting damage would be delayed depending on the extent of rainfall. Under these circumstances it would be anomalous if liability for damages resulting from fraudulent concealment were to vanish simply because of the fortuitous event of an intervening resale. Ultimately in such a case it is the subsequent purchaser who is directly damaged by the initial nondisclosure. (Compare *Bell* v. *Renaldo, supra,* 51 Cal.App.3d 779, 782.) The original purchaser neither suffers damage nor has knowledge to disclose.

It is true that there is contrary authority in California. In *Cohen* v. *Citizens Nat. Trust etc. Bank* (1956) 143 Cal.App.2d 480 [300 P.2d 14] the court held that a vendor was not liable to subpurchasers for failing to disclose building code violations to the original purchaser, because the vendor could not have intended to induce action on the part of the subpurchasers who he did not know would exist. However, the *Cohen* decision has recently been criticized by this district as an "unacceptably broad" limitation of liability for indirect representation in light of current trends. (*Varwig* v. *Anderson-Behel Porsche/Audi, Inc., supra,* 74 Cal.App.3d 578, 582.) As the court explained in *Varwig:* "The doctrine limiting liability for deceit stems from an 1889 decision of the

---

[9]In *Varwig,* defendant sold a car to a company which resold it to plaintiff. The car was then repossessed by the original seller who had sold it to a person who had turned it in to defendant for credit on another car. Plaintiff contended that defendant misrepresented itself to be the owner. Summary judgment for defendant was reversed on the ground that an actionable representation may be made indirectly so long as plaintiff is within the class of persons defendant intended to defraud. It was enough that defendant was put on notice that resale was intended, and had reason to expect that the misrepresentation would be repeated.

House of Lords (*Denny* v. *Peek*, 14 A.C. 337). A leading text writer has pointed out that American courts have greatly modified the limitation (Prosser, Law of Torts (4th ed.) pp. 699-710). This area of the law 'has been undergoing change in the direction of liberalizing the rules as to the expected reliance,' and the Restatement emphasizes that it 'is not intended to foreclose or discourage further developments.' (Rest.2d Torts, § 531, com. h.)" (*Varwig* v. *Anderson-Behel Porsche/Audi, Inc., supra*, 74 Cal.App.3d 578, 582.)[10]

We find no difficulty in extending the law of deceit to the situation presented here. Although a developer does not know that there will be subpurchasers, it is foreseeable that there will be and that they will be the ones to suffer damage. The developer has every reason to expect that if there are subpurchasers, a nondisclosure about subsurface soil conditions will be passed on to them. Perhaps most important, the rule we announce does not extend the vendor's liability at all—it merely fails to reduce it. At the same time, without such a rule, the subpurchaser has no remedy because he or she can only turn to the vendor with knowledge for recovery.[11] (Cf. *Bell* v. *Renaldo, supra*, 51 Cal. App.3d 779, 782.)

As there is thus substantial evidence to support a finding of each element of each appellant's action based on fraudulent concealment, the judgment of nonsuit in favor of the Smith respondents must be reversed.

### III.

*Did the trial court err in eliminating appellants' fault theories against the City and State through pretrial order?*

---

[10]Other states have extended liability to subpurchasers in certain cases. For example, in *Handy* v. *Beck* (1978) 282 Ore. 653 [581 P.2d 68], the appellate court reversed a trial court determination that the plaintiff, who was a successor in interest to the owners who had a well drilled by the defendant driller, could not recover for damages caused by the well. The court held that the defendant could be deemed to have intended that the plaintiff or anyone else rely or act upon a false report filed by him with the state engineer. (See also *Williams* v. *Benson, supra*, 141 N.W.2d 650, discussed at p. 190, *ante*.)

[11]For fraudulent concealment to be actionable, the vendor must have knowledge of the concealed fact. (See fn. 7, p. 190, *ante*.)

After a pretrial conference[12] in chambers, the trial court eliminated appellants' theories of public employee negligence and dangerous condition of public property on the ground that counsel would not give assurances that he intended seriously to pursue these theories at trial. Appellants objected, stating that while it was their preliminary intention not to go to the jury on those issues, they wanted to preserve the issues and not "be forced to an election."

Rule 212 of the California Rules of Court provides in part: "(a) At the pretrial conference, whether in the courtroom or in chambers, the judge, without adjudicating controverted facts, may consider and act upon the following matters: . . . (3) Simplification of the factual and legal issues involved." The purpose of the pretrial conference is "to relieve the members of the legal profession and the members of the judiciary from legal technicalities, trivia, details, unessentials, and to have the case tried at an early date upon the real and substantial issues in the case." (*Baird* v. *Hodson* (1958) 161 Cal.App.2d 687, 689 [327 P.2d 215], quoted in 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 57, p. 2894.)

We agree with the trial court that at the outset of trial, after completion of discovery, it was not unreasonable to expect appellants' counsel to have selected his theories of recovery. He was not, as he claims, forced to an election. (Cf. *Smart* v. *City of Los Angeles* (1980) 112 Cal.App.3d 232, 239 [169 Cal.Rptr. 174].) He could have pursued these theories had he indicated such an intention. Apparently for tactical reasons, he chose not to do so. The rules of pretrial procedure provide sufficient authority for the trial court's elimination of these theories under the circumstances. Appellant having cited no authority to the contrary, we affirm this determination of the trial court.

## IV.

*Did the trial court err in eliminating appellants' nuisance theory against the City and State at the close of appellants' case?*

[12]The trial court in this case held the pretrial conference at the outset of trial after the jury had been selected, but before opening statements. There were no pretrial statements. Although appellants complain that there was less than a day's notice (see rule 209(b), Cal. Rules of Court, which provides for a 60-day notice), no objection for lack of notice appears on the record. (See *Knowles* v. *Robinson* (1963) 60 Cal.2d 620, 627-628 [36 Cal.Rptr. 33, 387 P.2d 833] (failure to comply with pretrial conference rules raises no jurisdictional issue and prejudice must be shown); *American Home Assurance Co.* v. *Essy* (1960) 179 Cal.App.2d 19, 22 [3 Cal.Rptr. 586].)

In eliminating appellants' nuisance[13] count, the trial court relied on *Mikkelsen* v. *State of California* (1976) 59 Cal.App.3d 621 [130 Cal. Rptr. 780], which it interpreted as holding that public entities are immune from suit for nuisance based on design and construction of public improvements. *Mikkelsen,* however, does not provide for absolute immunity in such cases. *Mikkelsen* held that Government Code section 830.6 applies to nuisance actions.[14] Section 830.6 provides that public entities are not liable for injury caused by public improvements *if* the improvements have been approved in advance or designed in accordance with previously approved standards *and* there is substantial evidence on the basis of which a reasonable governmental entity could have adopted or approved the design or standards.[15] Moreover, this immunity can be lost if the improvement falls out of conformity with the above standard and the public entity does not correct the deficiency within a reasonable period of time. (*Ibid.*)

---

[13]Nuisance is defined in Civil Code section 3479 as follows: "Anything which is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a nuisance."

[14]The California Supreme Court had held that the general rule of governmental immunity provided in Government Code section 815 alone does not preclude a nuisance action against a government entity founded on Civil Code section 3479. (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920 [101 Cal.Rptr. 568, 496 P.2d 480].)

[15]The full text of section 830.6 is as follows: "Neither a public entity nor a public employee is liable under this chapter for an injury caused by the plan or design of a construction of, or an improvement to, public property where such plan or design has been approved in advance of the construction or improvement by the legislative body of the public entity or by some other body or employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved, if the trial or appellate court determines that there is any substantial evidence upon the basis of which (a) a reasonable public employee could have adopted the plan or design or the standards therefor or (b) a reasonable legislative body or other body or employee could have approved the plan or design or the standards therefor. Notwithstanding notice that constructed or improved public property may no longer be in conformity with a plan or design or a standard which reasonably could be approved by the legislative body or other body or employee, the immunity provided by this section shall continue for a reasonable period of time sufficient to permit the public entity to obtain funds for and carry out remedial work necessary to allow such public property to be in conformity with a plan or design approved by the legislative body of the public entity or other body or employee, or with a plan or design in conformity with a standard previously approved by such legislative body or other body or employee. In the event that the public entity is unable to remedy such public property because of practical impossibility or lack of sufficient funds, the immunity provided by this section shall remain so long as such public entity shall reasonably attempt to provide adequate warnings of the existence of the condition not conforming to the ap-

The State concedes that there is insufficient evidence in the record to support the defense of design immunity,[16] but contends that the trial court's determination should be affirmed in any event because there was no substantial evidence that any act or omission on the part of the public entities was a proximate cause of appellants' damage.[17] We cannot agree.

■ Appellants' soils engineer testified that the State and City inadequately designed, constructed and maintained storm drain systems which accelerated the slide condition caused by Smith's inadequate repair of the preexisting seeps, springs and slides, and that as such it was a contributing factor. Smith's civil engineer testified that in his opinion the drainage from the State freeway outfall to the relocated natural stream bed eroded the toe of the slope, the slope started to cave down into the erosion, the water then washed the loose soil down the channel, and this caused the slide which gradually worked its way back into the fill. This testimony was sufficient to support a finding of proximate cause. Therefore, in light of the insufficiency of evidence in the record to support the defense of governmental design immunity, it was error to eliminate appellants' nuisance theory against the City and State.[18]

---

proved plan or design or to the approved standard. However, where a person fails to heed such warning or occupies public property despite such warning, such failure or occupation shall not in itself constitute an assumption of the risk of the danger indicated · by the warning."

[16]The City contends that the trial court correctly found design immunity to bar the nuisance action, but points to no evidence in the record to support its contention.

[17]The State also argues that the trial court's determination should be upheld because there was no substantial evidence of negligence on its part. However, Government Code section 830.6 contemplates a burden on the public entity to produce substantial evidence that it was reasonable before availing itself of design immunity, not on the plaintiff to produce evidence that it was not. The State also neglects to mention the City's objection to appellants' offer to prove negligence which the trial court sustained on the ground that all fault theories had been eliminated by the pretrial order. Finally, nuisance does not require proof of negligence. (See Civ. Code, § 3479.)

[18]This error was not rendered harmless by the verdict in favor of the City and State on the inverse condemnation cause of action, discussed in the following two sections. We are not prepared to say that the jury necessarily determined that appellants' damages were not proximately caused by the City or State. This is especially so in light of the jury's confusion over what constituted a public improvement. Inverse condemnation requires that the damages be caused by the "improvement as deliberately designed and constructed." (*Holtz* v. *Superior Court* (1970) 3 Cal.3d 296, 303 [90 Cal.Rptr. 345, 475 P.2d 441].) Nuisance, on the other hand, is any interference with the comfortable enjoyment of property, whether deliberate or not. It is possible that a jury could find

## V.

*Was the jury properly instructed on inverse condemnation?*

Article I, section 19 (formerly art. I, § 14) of the California Constitution requires that just compensation be paid when private property is taken or damaged for public use. (See *Varjabedian* v. *City of Madera* (1977) 20 Cal.3d 285, 296 [142 Cal.Rptr. 429, 572 P.2d 43].) An inverse condemnation suit is one "by an owner to recover damages for injury to his property from some public works undertaking or other activity by an agency with power to condemn." (5 Witkin, Summary of Cal. Law (8th ed. 1974) Constitutional Law, § 579, p. 3876.)

With regard to what a plaintiff must show in such a suit, the California Supreme Court has made the following comments: "'[T]he right assured to the owner by this provision of the constitution is not restricted to the case where he is entitled to recover as for a tort at common law. If he is consequently damaged by the work done, whether it is done carefully and with skill or not, he is still entitled to compensation under this provision.'" (*Holtz* v. *Superior Court, supra*, 3 Cal.3d 296, 303, quoting from two prior decisions.) And further: "with only two exceptions[19] . . . '*any actual physical injury to real property proximately caused by the improvement as deliberately designed and constructed is compensable under article I, section 14, of our Constitution whether foreseeable or not.*'" (*Ibid.*, quoting from *Albers* v. *County of Los Angeles* (1965) 62 Cal.2d 250, 263-264 [42 Cal.Rptr. 89, 398 P.2d 129], italics in *Holtz*; see also *Marin* v. *City of San Rafael* (1980) 111 Cal.App.3d 591, 595 [168 Cal.Rptr. 750] (storm drainage systems created, approved, or accepted by public entities are public improvements).)

Based on the authority of *Holtz*, and as requested by appellants, the trial court gave the following instruction to the jury: "A public entity is

---

that while the drainage system as originally "deliberately designed and constructed" did not cause appellants' damages, other conduct on the part of the City and State did. Such conduct could include negligent maintenance of the improvement, negligent approval of Smith's subdivision and drainage system, and negligent failure to redesign the improvement in light of changed conditions. (See *Baldwin* v. *State of California* (1972) 6 Cal.3d 424 [99 Cal.Rptr. 145, 491 P.2d 1121].)

[19]The two exceptions, neither applicable here, are (1) damages "'inflicted in the proper exercise of the police power,'" and (2) where state at common law "'had the *right* to inflict the damage.'" (*Holtz* v. *Superior Court, supra*, 3 Cal.3d 296, 305, quoting from earlier cases, italics in earlier case.)

liable for any actual physical injury to real property a proximate cause of which is a public improvement as deliberately designed and constructed."[20] During deliberations the jury submitted several questions and requests. In the course of further instruction on the record the foreperson asked the court to define "public property improvements." The court responded that "a public improvement is something designed and constructed and created at public expense by a public entity for the public." The next day the court supplemented the instruction in the following manner: "[T]he term public improvement will also include construction, the plans and specifications for which are approved in advance by a public agency, which are then constructed by private persons and are dedicated to and accepted by the public agency."

We do not believe that the jury was erroneously instructed. It was not told that the culvert and drainage pipes were public improvements and that the ditch into which they emptied was not, as appellants suggest. They were instructed that the term public improvement included "something designed and constructed and created" and "construction" approved and accepted, which contemplates the entire drainage system and, for that matter, the initial relocation of the natural stream bed. Appellants complain that certain testimony reread to the jury at its request included testimony of the City's director of public works to the effect that the City did not assume responsibility for the maintenance of the channel itself as opposed to the pipes. Appellants had their opportunity to object to testimony at trial and to argue its weight in closing. We do not see how this testimony can render the instruction as given erroneous.

## VI.

### *Was the defense verdict supported by substantial evidence?*

Appellants' final contention is that the jury verdict was unsupported by the evidence. The jury's verdict must be affirmed if it is supported by substantial evidence. (See, e.g., *Nestle* v. *City of Santa Monica, supra,* 6 Cal.3d 920, 925; *Elgin Capital Corp.* v. *County of Santa Clara* (1975) 57 Cal.App.3d 687, 690 [129 Cal.Rptr. 376]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 249, p. 4241.) Respon-

---

[20]The court also gave BAJI No. 3.75 (6th ed. 1977) on proximate cause, and, at appellants' request, a concurrent cause instruction based on BAJI No. 3.77 (6th ed. 1977).

dents City and State argue that there was substantial evidence, in the form of expert testimony, that neither the State's nor the City's drainage systems caused appellants' damages and that the damages stemmed instead from Smith's placement of fill and inadequate repair of previous slides. As we noted earlier, the expert testimony on causation was conflicting. Resolving all conflicts in favor of the verdict for respondents City and State as we must, we cannot say that there is no substantial evidence which supports the jury's verdict.

## Conclusion

The nonsuit in favor of the Smith respondents is reversed. The elimination of the nuisance action in favor of the City and State is also reversed. In all other respects, the judgments are affirmed. Costs to appellants.

Rouse, J., and Miller, J., concurred.

A petition for a rehearing was denied July 29, 1982, and the petition of respondents Earl W. Smith, Earl W. Smith Developers, Ltd., and Earl W. Smith Development Organization for a hearing by the Supreme Court was denied September 8, 1982.