Opinion
 

 KREMER, P. J.
 

 This litigation involves polybutylene plumbing which was installed in homes in Briarwood Pointe (Briarwood) and leaked in the majority of the homes. A jury awarded the Briarwood homeowners $316,977 in compensatory damages
 
 [1]
 
 against the manufacturers and sellers of the plumbing parts and plumbing system (United States Brass Corporation (U.S. Brass),
 
 [2]
 
 Admiral Marine Products Company (Admiral Marine)) and the manufacturers of the raw materials to make the system components (Shell Oil Company (Shell), Hoechst Celanese Corporation (Celanese)) on theories of strict liability, fraud (except as to Admiral Marine), breach of warranty and negligence.
 
 [3]
 
 The jury also awarded the homeowners $317,000 in punitive damages.
 
 [4]
 
 The developer of Briarwood, Coles Development Company, Inc. (Coles), which had settled with the homeowners and cross-complained against the remaining defendants, prevailed on its claims for implied indemnification and fraud (except no fraud finding was made against Admiral Marine). The jury awarded Coles punitive damages of $48 million
 
 [5]
 
 which
 
 *1346
 
 was later reduced to $2 million after Coles accepted a remitter reducing the award in lieu of the court’s granting a new trial on the punitive damages.
 
 [6]
 

 All parties appeal. Shell, Celanese and U.S. Brass contend they could not be held liable for fraud because the plaintiffs failed to prove any actual reliance on the defendants’ asserted misrepresentations. All the defendants contend they were not strictly liable to those homeowners who had not experienced any leaks. Shell and Celanese also contend they could not be held strictly liable because they were only raw material suppliers and the strict liability instructions were improper. Shell, Celanese and U.S. Brass also contend the court erred in admitting certain evidence and excluding other evidence, jury instructions given to the jury when they were deadlocked on the punitive damages issue were improper, and the awards of punitive damages were improper. Celanese and Shell contend the court erred in holding their Code of Civil Procedure section 998 offers were invalid. Shell additionally contends reversal is required because another attorney in the law firm which represented Cole was representing Shell in an unrelated matter while this proceeding was pending. Admiral Marine contends there was no evidence showing any of its fittings malfunctioned, it should be liable for damages only based on those homes in which its fittings were found, it should not have been held jointly and severally liable with the other defendants, and the judgment in favor of Coles should be reversed because Coles néver served it with the operative cross-complaint.
 

 The homeowners contend the court erred in excluding evidence relating to the homeowners’ emotional distress damages, erred in denying their application for an injunction under the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.) and erred in excluding evidence relating to physical injury and malice, and in awarding attorney fees based on the homeowners’ contingent fee agreement rather than the actual time expended by their attorneys. Coles contends the court erred in reducing its punitive damages and in denying its claims for attorney fees and costs in defending the homeowners’ lawsuit.
 

 We reverse in part.
 

 Facts
 

 A.
 
 The Polybutylene Plumbing System
 

 The polybutylene plumbing system, “Qest Qick/Sert II,” installed in Briarwood was manufactured and sold by U.S. Brass. The system consisted
 
 *1347
 
 of pipes made from polybutylene resin supplied in pellet form by Shell and fittings made of “Celcon,” a resin manufactured by Celanese. U.S. Brass manufactured the pipes from the polybutylene resin, molded the Celcon fittings, designed crimp rings and crimping tools and sold the plumbing system to supply houses who in turn sold it to builders and plumbers. Admiral Marine also sold Celcon fittings which were manufactured by another company and then distributed in turn through a third company, Vanguard Plastics, Inc. Plumbers attached the pipes together by placing a Celcon fitting between the pipes, fitting a crimp ring over the connection between the pipes and the fitting, and crimping the ring with a large crimping tool.
 

 B.
 
 Marketing
 

 .Shell became sole supplier of polybutylene resin in the United States
 
 [7]
 
 and developed a plan to market polybutylene plumbing to developers, plumbers, local building officials and construction industry code bodies. Shell followed through on this marketing plan and lobbied local building code officials, plumbers and developers to approve the polybutylene plumbing system for residential developments. Some of the presentations were jointly made by representatives from both U.S. Brass and Shell. Shell additionally created its own magazine,
 
 The Piper,
 
 to tout the system to code bodies and others.
 

 Celanese promoted the use of Celcon to U.S. Brass and the plumbing industry. Celanese relied, in part, on Shell’s marketing efforts. For example, in an internal marketing research report for Celanese, it was noted: “Shell has been extremely active in this area and has several people located around the country among whose major responsibilities include calling on code bodies and promoting the use of polybutylene tubing. Celcon usage has been helped dramatically by their efforts because most acetal [e.g., Celcon] fittings are sold in conjunction with polybutylene tubing. Without Shell greasing the way, Celcon would not have as high a penetration as we currently enjoy.”
 

 C.
 
 Representations and Omissions About the Plumbing System and Defects in the System
 

 The plaintiffs presented evidence that Shell, Celanese and U.S. Brass promoted the Qest Qick/Sert II system as appropriate for cold and hot water residential applications, as long lasting and easy to install. The plaintiffs
 
 *1348
 
 presented evidence tending to show the system was not suitable for residential plumbing because chlorine found in potable water deteriorated the pipe and fittings and the deterioration was exacerbated by exposure to hot water, situations common in potable household water systems. Additionally, the plaintiffs presented evidence indicating it was difficult to install the system due to difficulties in determining whether the crimps met the required and precise specifications.
 

 The plaintiffs presented evidence indicating the defendants knew about the chlorine and hot water problems with the system and were aware of leaks in the system prior to its installation at Briarwood. The plaintiffs presented evidence indicating U.S. Brass and Shell in their sales presentations did not tell potential customers or code approval bodies about problems with the system and misrepresented the ease of installation and lifespan of the system.
 

 D.
 
 The Briarwood Homes
 

 Coles built the Briarwood homes between 1982 and 1983, with all homes completed by January 31, 1983. Coles’s director of construction was responsible for choosing both the plumbing subcontractor and the plumbing system for Briarwood; he directed the plumbing subcontractor to use polybutylene rather than copper plumbing. The plumbing on the Briarwood homes was completed by January 31, 1983. Within a year, the polybutylene plumbing started to leak in one of the Briarwood homes. Eventually, leaks developed in 30 of the 41 homes in Briarwood.
 

 Discussion
 

 I
 

 Fraud
 

 Shell, Celanese and U.S. Brass contend the homeowners and Coles were not entitled to recover on a fraud theory because there was no evidence either the homeowners or Coles actually relied on any misrepresentations or omissions made by Shell, Celanese or U.S. Brass.
 

 Both the plaintiffs and defendants have identified
 
 Mirkin
 
 v.
 
 Wasserman
 
 (1993) 5 Cal.4th 1082 [23 Cal.Rptr.2d 101, 858 P.2d 568] as the key case on this issue. The defendants argue
 
 Mirkin
 
 requires reversal of the fraud findings because
 
 Mirkin
 
 requires actual reliance on the alleged misrepresentations and rejected a “fraud-on-the-market” theory of presumed reliance. The
 
 *1349
 
 defendants argue the plaintiffs failed to show actual reliance and that their argument here is a variation of the fraud-on-the-market theory. The plaintiffs argue
 
 Mirkin
 
 is distinguishable and moreover that
 
 Mirkin
 
 did not overrule case law holding that reliance sufficient for a fraud finding may be based on an indirect communication to the plaintiff, i.e., a communication made to an agent who acts on behalf of the principal or a communication made to a third person with knowledge or reason to believe that the communication will be repeated to another.
 
 [8]
 
 The plaintiffs argue the misrepresentations here were indirectly communicated to them through the plumbing subcontractor and by the City of San Diego’s approval of polybutylene plumbing in residential housing.
 

 In
 
 Mirkin,
 
 the plaintiffs were shareholders in a health plan corporation. They sought to recover in fraud from the corporation and its officers and directors, from an accounting firm and from underwriting firms for the defendants’ misrepresentations of the corporation’s financial condition in prospectuses and other public communications which had inflated the price. The plaintiffs had neither read the prospectuses nor heard the public communications. The plaintiffs stated they had purchased the shares “ ‘[i]n reliance upon the integrity of the securities market and the securities offering process, and the fidelity, integrity and superior knowledge of defendants
 
 (Mirkin
 
 v.
 
 Wasserman, supra,
 
 5 Cal.4th at p. 1088.) They argued that a “ ‘fraud-on-the-market’ doctrine obviate[d] the need to plead and prove actual reliance in cases where material misrepresentations are alleged to have affected the market price of stock.”
 
 (Ibid.)
 
 The
 
 Mirkin
 
 court rejected this fraud-on-the-market theory, stating: “It is settled that a plaintiff, to state a cause of action for deceit based on a misrepresentation, must plead that he or she actually relied on the misrepresentation.”
 
 (Ibid.)
 

 The plaintiffs argued “actual reliance cannot logically be an element of a cause of action for deceit based on an omission because it is impossible to demonstrate reliance on something that one was not told.”
 
 (Mirkin
 
 v.
 
 Wasserman, supra,
 
 5 Cal.4th at p. 1093.) The court rejected the argument, explaining: “Contrary to plaintiffs’ assertion, it is not logically impossible to prove reliance on an omission. One need only prove that, had the omitted information been disclosed,
 
 one would have been aware of it
 
 and behaved differently.”
 
 (Ibid.,
 
 italics added.) Since the
 
 Mirkin
 
 plaintiffs would not have been aware of the omitted information because they had not read the
 
 *1350
 
 prospectuses or heard the public communications, they had failed to plead the necessary reliance.
 

 The
 
 Mirkin
 
 plaintiffs argued it was not necessary to show the misreprer sentations were communicated directly to them but rather that “indirect communication suffices.” In response, the
 
 Mirkin
 
 court stated: “While the principle is valid, it does not help these plaintiffs, who cannot plead that the alleged misrepresentations ever came to their attention.”
 
 (Mirkin
 
 v.
 
 Wasserman, supra,
 
 5 Cal.4th. at p. 1095.)
 

 As to cases where a communication was made indirectly to the plaintiff through the plaintiff’s agent, the
 
 Mirkin
 
 court explained “the cases[
 
 9
 
 ] expressly relied on agency principles rather than the concept of a fraud on the market” and therefore were distinguishable.
 
 (Mirkin
 
 v.
 
 Wasserman, supra,
 
 5 Cal.4th. at p. 1097.) Under agency principles, the fraud worked upon the agent by misrepresentation or by silence was worked upon the principal and the principal thus had a right to sue for fraud.
 
 (Id.
 
 at p. 1098.)
 

 As to indirect communication cases coming under the theory of section 533 of the Restatement Second of Torts, the
 
 Mirkin
 
 court stated:
 

 “The Restatement Second of Torts section 533, articulates the relevant principle in this way: ‘The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transactions involved.’ A few cases in this state expressly apply section 533 [citations] and several cases that predate section 533 apply the principle that the section restates [citations].
 

 “These cases offer plaintiffs no assistance. As the language of the Restatement indicates, a plaintiff who hears an alleged misrepresentation indirectly must still show ‘justifiable reliance upon it . . . .’ (Rest.2d Torts, § 533.)”
 
 (Mirkin
 
 v.
 
 Wasserman, supra,
 
 5 Cal.4th 1082, 1095-1096, fn. omitted.)
 

 
 *1351
 
 The Supreme Court noted “[t]he need to show reliance is confirmed by the opinions in this state addressing claims for deceit based on indirect communications.”
 
 (Mirkin
 
 v.
 
 Wasserman, supra, 5
 
 Cal.4th at p. 1096.)
 
 [10]
 
 The court pointed to two cases which had expressly applied section 533 of the Restatement Second of Torts:
 
 Varwig
 
 v.
 
 Andérson-Behel Porsche/Audi, Inc.
 
 (1977) 74 Cal.App.3d 578 [141 Cal.Rptr. 539] (Varwig) and
 
 Barnhouse
 
 v.
 
 City of Pinole
 
 (1982) 133 Cal.App.3d 171, 191 [183 Cal.Rptr. 881]
 
 (Barnhouse),
 
 cases upon which the plaintiffs in our case also rely.
 
 [11]
 
 The
 
 Mirkin
 
 court in holding these cases did not “support the plaintiffs’ position,” explained, “To say that a plaintiff who relies on secondhand misrepresentations can state a cause of action for deceit is not to say that reliance may be presumed, as plaintiffs contend.”
 
 (Mirkin
 
 v.
 
 Wasserman, supra,
 
 5 Cal.4th 1082, 1097.) In those cases, the court explained, the plaintiffs had “received the same misleading communications” as the person to whom the communication was originally made.
 
 (Ibid.)
 

 In sum, in
 
 Mirkin,
 
 the Supreme Court reaffirmed the need to show actual reliance on a defendant’s misrepresentations or omissions as a prerequisite to
 
 *1352
 
 establishing fraud, and recognized that the misrepresentations to the plaintiff may be communicated indirectly through an agent or third party.
 

 The plaintiffs contend the Supreme Court’s recent decision in
 
 Randi W.
 
 v.
 
 Muroc Joint Unified School Dist.
 
 (1997) 14 Cal.4th 1066 [60 Cal.Rptr.2d 263, 929 P.2d 582], supports their contention they were not required to prove actual reliance on the defendants’ misrepresentations.
 

 In
 
 Randi W.,
 
 the issue before the court was “under what circumstances courts may impose tort liability on employers who fail to use reasonable care in recommending former employees for employment without disclosing material information bearing on their fitness.”
 
 (Randi W.
 
 v.
 
 Muroc Joint Unified School Dist., supra,
 
 14 Cal.4th at p. 1070.) In
 
 Randi W.,
 
 a student alleged she had been sexually assaulted by a school employee. She sued the school district who had written recommendation letters for the employee which had failed to disclose sexual misconduct charges and complaints made against the employee. The Supreme Court held the trial court should not have sustained a demurrer without leave to amend to the plaintiff’s causes of action for fraud and negligent misrepresentation even though the plaintiff had failed to allege actual reliance on the school district’s letters of recommendation. The Supreme Court concluded it was sufficient that the plaintiff had alleged officials at her school had relied on the recommendation letters and further noted that it was improper to sustain a demurrer without leave to amend on this basis. The Supreme Court stated:
 

 “Under the Restatement [Second of Torts] provisions [§§ 310, 311], plaintiff need only allege that her injury resulted from action that
 
 the recipient
 
 of defendants’ misrepresentations took in reliance on them. In a case involving false or fraudulent letters of recommendation sent to prospective employers regarding a potentially dangerous employee, it would be unusual for
 
 the person ultimately injured
 
 by the employee actually to ‘rely’ on such letters, much less even be aware of them.”
 

 “In any event, as the Court of Appeal observed, failure to plead reliance would not be a ground for sustaining a demurrer without leave to amend.” (14 Cal.4th at p. 1085, italics in original.)
 

 The Restatement Second of Torts section 310 involves intentional conduct and provides:
 

 “An actor who makes a
 
 misrepresentation
 
 is subject to liability to another for
 
 physical harm
 
 which results from an act done by the other
 
 or a third person
 
 in reliance upon the truth of the representation, if the actor
 

 
 *1353
 
 “(a) intends his statement to induce or should realize that it is likely to induce action by the other, or a third person, which involves an unreasonable risk of physical harm to the other, and
 

 “(b) knows
 

 “(i) that the statement is false, or
 

 “(ii) that he has not the knowledge which he professes.” (Italics added.)
 

 The Supreme Court noted, “. . . the law certainly recognizes a
 
 policy of preventing future harm
 
 of the kind alleged here. One of society’s highest priorities is to protect children from sexual or physical abuse.”
 
 (Ranch W.
 
 v.
 
 Muroc Joint Unified School Dist., supra,
 
 14 Cal.4th at pp. 1078-1079, italics in original.) The Supreme Court found section 310 of the Restatement Second of Torts applied to the case before it: “Paraphrasing [section 310], here defendants allegedly made misrepresentations that resulted in physical harm to plaintiff by reason of an act done by [her school officials] (i.e., hiring [the employee])
 
 in reliance
 
 on the truth of the representations. Defendants intended or should have realized that their misrepresentations were likely to induce action by [her school officials] that involved an unreasonable risk of physical harm to plaintiff.”
 
 (Randi W.
 
 v.
 
 Muroc Joint Unified School Dist., supra,
 
 at p. 1084, italics in original.)
 

 Section 311 of the Restatement Second of Torts involves negligent conduct and provides:
 

 “(1) One who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information, where such harm results
 

 “(a) to the other, or
 

 “(b) to such third persons as the actor should expect to be put in peril by the action taken.
 

 “(2) Such negligence may consist of failure to exercise reasonable care
 

 “(a) in ascertaining the accuracy of the information, or
 

 “(b) in the manner in which it is communicated.”
 

 The Supreme Court found under Restatement Second of Torts section 311 that “plaintiff need only allege her injury resulted from action that
 
 the
 
 
 *1354
 

 recipient
 
 of defendants’ misrepresentations took in reliance on them” and pointed out that in a situation involving a recommendation letter about a potential dangerous employee, the person ultimately injured would only in the unusual case have actually relied on such a letter.
 
 (Randi W.
 
 v.
 
 Muroc Joint Unified School Dist, supra,
 
 14 Cal.4th at p. 1085.)
 

 The Supreme Court also rejected an argument that
 
 Mirkin
 
 v.
 
 Wasserman, supra,
 
 5 Cal.4th 1082, required proof of the plaintiff’s own reliance on the letters. The court noted the intermediate court had rejected the argument “observing that ‘[tjhose cases all involved claims only for damages resulting from economic loss as opposed to damages based on physical injury. . . . [Cjases involving only economic loss are subject to a more restrictive rule. [Citation.]’ ”
 
 (Randi W.
 
 v.
 
 Muroc Joint Unified School Dist., supra,
 
 14 Cal.4th at p. 1085.)
 

 We find
 
 Randi W.
 
 does not excuse the plaintiffs in this case from showing actual reliance. First, as is clear in
 
 Randi W.,
 
 plaintiffs who suffer only economic losses, i.e., Coles and those homeowners who suffered no property damage, are required to show actual reliance.
 

 Second, we believe
 
 Randi W.
 
 is factually distinguishable. Unlike the case before us,
 
 Randi W.
 
 involved a claim of physical injury to a person. Further, the decision was based on strong public policy considerations, i.e., that “[o]ne of society’s highest priorities is to protect children from sexual or physical abuse.”
 
 {Randi W.
 
 v.
 
 Muroc Joint Unified School Dist, supra,
 
 14 Cal.4th at pp. 1078-1079.) The Supreme Court in
 
 Randi W.
 
 explained: “Although policy considerations dictate that ordinarily a recommending employer should not be held accountable to third persons for failing to disclose negative information regarding a former employee, nonetheless liability may be imposed if, as alleged here, the recommendation letter amounts to an
 
 affirmative misrepresentation
 
 presenting a foreseeable and substantial risk of physical harm to a third person.”
 
 {Id.
 
 at p. 1070.)
 

 Here, in contrast to
 
 Randi W.,
 
 we have only property damages and no similar compelling public policy reasons which would justify excusing a plaintiff from showing actual reliance. The misrepresentations in this case did not involve a foreseeable and substantial risk of physical harm to a third person. The misrepresentations here were about the quality and durability of a product, i.e., essentially that the Qest Qick/Sert II system and its component parts were equivalent in quality and durability to a copper plumbing system. The risk was that the plumbing systems would leak and need to be replaced and might cause some property damage. While there was some risk of physical injury, that risk was not substantial; the evidence shows that
 
 *1355
 
 none of the homeowners in this case suffered a personal injury as a result of the misrepresentations.
 

 Third,
 
 Randi W.
 
 does not excuse a plaintiff from all showings of reliance.
 
 Randi W.
 
 held the plaintiff was required to show that there was actual reliance on the recommendation letter by the school district in hiring the employee. In other words, the plaintiff must establish actual reliance by an intermediary. As we subsequently explain, neither the homeowners nor Coles established such actual reliance by an intermediary. Their evidence, at most, shows only representations made generally to the market and is more akin to the fraud-on-the-market theory repudiated in
 
 Mirlan
 
 than the recommendation letter involved in
 
 Randi W.
 

 We conclude the plaintiffs were required to show actual reliance on the defendants’ misrepresentations.
 

 A.
 
 Recovery in Fraud—Coles
 

 Coles contends it established reliance on communications made indirectly to it through its plumbing subcontractor and through the San Diego code body’s approval of polybutylene for residential housing. Coles’s cited evidence, however, does not support these contentions.
 

 1.
 
 Plumbing Subcontractor
 

 There is evidence in the record indicating U.S. Brass made a sales presentation and presented a clinic on the installation of the polybutylene system to the plumbing subcontractor. During this sales presentation, U.S. Brass communicated only the advantages and not the problems with the polybutylene plumbing system. There is, however, no cited evidence indicating these communications were passed along to Coles or that Coles relied on these communications in deciding to use the polybutylene system.
 

 Coles’s director of construction, Robert Haig, testified he had first “heard” about polybutylene plumbing some time in the 1970’s while he was working for another developer. At some point in the past, he had reviewed some unidentified literature about the system. He had never spoken with any representatives of U.S. Brass, Shell or Celanese. He did not recall any literature about the system being provided by the plumbing subcontractor and did not recall any specific discussions with the plumbing subcontractor about the system. Haig decided to use the polybutylene system because it had been used in a prior Coles project (Skyline), was being used in the industry, “was touted as being a better system, [including being] more cost
 
 *1356
 
 efficient,” “was accepted by the local agencies,” and was “being installed by reputable subcontractors.”
 

 The plumbing subcontractor testified he did not make the decision to use polybutylene plumbing in the Briarwood project; he had originally bid for the project using copper plumbing and used polybutylene plumbing only because he was directed to do so by Coles’s director of construction. The plumbing contractor would have preferred to use copper but Coles insisted on the polybutylene system. Installation of polybutylene plumbing was about $300 or $400 cheaper per house than using copper plumbing.
 

 This evidence shows Coles’s decision to use polybutylene plumbing was not based on any reliance on the plumbing subcontractor’s statements about the polybutylene system which had been communicated to the plumber by U.S. Brass or any of the other defendants. Rather, Coles independently decided to use polybutylene plumbing and directed the plumbing subcontractor to install it. Coles is thus not entitled to recover for fraud based on a theory it actually relied on indirect communications of the defendants made to Coles through the plumbing subcontractor.
 

 2.
 
 Reliance on Code Approval
 

 Coles’s construction director’s reasons for selecting a polybutylene plumbing system included that polybutylene had been approved by the City of San Diego. The evidence indicates the San Diego Building Inspection Department allowed polybutylene before the City of San Diego had adopted a Uniform Plumbing Code that permitted use of polybutylene plumbing.
 
 [12]
 

 The plaintiffs presented evidence showing Shell had a marketing plan to lobby local code bodies for approval and that representatives from Shell and U.S. Brass made presentations to code approval bodies lobbying for approval of polybutylene in residential housing. The plaintiffs, however, do not cite any evidence that shows the city relied on any representation made by U.S. Brass, Shell or Celanese in approving use of polybutylene plumbing.
 

 The plaintiffs cite the testimony of Philip Tripp, a salesman for U.S. Brass who stated he was “sure” he went to San Diego although he could not remember any of the specifics. He “believe[dj” Marty O’Brien, a marketing representative from Shell, may have attended “a Uniform Building Code
 
 *1357
 
 meeting.” However, Tripp also stated the City of San Diego had already approved of the use of polybutylene plumbing in overhead applications before he “came on board” in 1980.
 
 [13]
 
 Testimony from a building inspector with the San Diego Building Inspection Department indicated the city approved polybutylene plumbing in 1978.
 
 [14]
 

 The plaintiffs cite to the testimony of Mark Beauchamp, a building inspection manager. Beauchamp testified about U.S. Brass and Shell presentations of the polybutylene system, but Beauchamp was not involved in the approval of polybutylene in the City of San Diego; Beauchamp was a building inspection manager for the City of Pico Rivera at the time.
 
 [15]
 
 There was also testimony by Joseph Pierpaoli, a field inspector and senior mechanical inspector of the San Diego Building Inspection Department, but he was not involved in making the decision to approve the use of polybutylene in San Diego.
 

 This evidence is insufficient to support actual reliance on the defendants’ alleged misrepresentations. The indirect communications fraud theory requires a chain of fraudulent representations which are repeated by one victim to another. It must be shown the defendant made misrepresentations or omissions directly to one victim who then repeated the misrepresentations or omissions to another who thus was an indirect recipient of the defendant’s communications. Coles failed to establish all the necessary links in the chain; it failed to establish the link from the defendants to the city. Coles failed to present evidence establishing any defendant communications were made to or relied on by the city or repeated to it through the code approval bodies. Without any proof that the city heard or relied on the defendants’ misrepresentations or omissions in making its decision to approve polybutylene plumbing, Coles’s theory is akin to the fraud-on-the-market theory disapproved in Mirkin, i.e., a theory that the plaintiff is entitled to rely on the integrity of the market, which in the case of plumbing systems requires code approval, and is not required to prove actual reliance on any misrepresentations or omissions made by the defendant. As the
 
 Mirkin
 
 court noted, in indirect communication cases, it is still necessary to show the
 
 *1358
 
 misrepresentations (or omissions) were communicated by the intermediary to the plaintiff.
 

 Coles points to language in
 
 Mirkin
 
 discussing the extension of fraud “liability to ‘those situations in which an intermediary has conveyed the misrepresentation in the form of a rating, certification, recommendation, or market price.’ ”
 
 (Mirkin
 
 v.
 
 Wasserman, supra, 5
 
 Cal.4th 1082, 1100, fn. 6.) The dissent argued case law had so extended the fraud doctrine and cited
 
 Learjet Corp.
 
 v.
 
 Spenlinhauer
 
 (1st Cir. 1990) 901 F.2d 198 in support.
 
 (Mirkin
 
 v.
 
 Wasserman, supra,
 
 at pp. 1112-1113 (dis. opn. of Kennard, J.).) The majority responded:
 

 “As we have already explained (see
 
 ante,
 
 pp. 1095-1100), the relevant authorities do not support the dissent’s position. Nor does the opinion in
 
 Learjet Corp.
 
 v.
 
 Spenlinhauer
 
 (1st Cir. 1990) 901 F.2d 198 (cited in dis. opn. of Kennard, J.,
 
 post,
 
 pp. 1112, 1117-1118), a less clearly relevant case on which the dissent also relies. The federal court in
 
 Learjet,
 
 applying Kansas law, held that the buyer of an airplane had stated a cause of action for fraud based on the allegation that the craft’s manufacturer had made certain representations to the Federal Aviation Administration in order to have it certified as airworthy. (901 F.2d at pp. 200-204.)
 

 “Learjet
 
 says nothing about the fraud-on-the-market doctrine, and no court has relied upon that case to justify the doctrine’s adoption. Indeed, the case is inapposite. In contrast to a governmental certification, which necessarily implies that the particular representations required to obtain the certification have been made, a market price necessarily implies only that some buyer is willing to pay the quoted price.” (5 Cal.4th at p. 1100, fn. 6.)
 

 This discussion in
 
 Mirkin
 
 does not assist Coles. While the
 
 Mirkin
 
 majority did not reject the concept that indirect reliance could be based on a government rating, certification, recommendation or market price (or, similarly, a plumbing code approval), the majority did not accept the proposition that reliance on the government approval was alone sufficient without a showing the government approval was based on misrepresentations by the defendant. The majority further distinguished
 
 Learjet
 
 on the basis that certain representations had been made to the government in order to obtain the certificate. Here, Coles failed to show any such representations were made by the defendants in order to obtain the government approval.
 

 We conclude Coles failed to show it actually relied on the defendants’ misrepresentations, either directly or indirectly, and accordingly, we reverse the findings of fraud against the defendants in favor of Coles.
 

 
 *1359
 
 B.
 
 Homeowners
 

 The homeowners’ fraud claim is even more tenuous than Coles’s claim. Not only is there is no evidence that any of the defendants communicated with the homeowners, there was no evidence anyone made any representations about the plumbing system to the homeowners. The homeowners do not cite any evidence indicating they knew what type of plumbing was in the homes or made the decision to purchase their homes based on representations about the plumbing system.
 
 [16]
 
 At most, the evidence indicates the homeowners relied on Coles’s general warranty, i.e., that the plumbing system was built to code and fit for residential housing. Since there is no evidence the homeowners ever read or heard of the defendants’ misrepresentations, directly or indirectly, or acted in reliance on any statements by the defendants in purchasing their homes, we reverse the fraud judgment as to the homeowners.
 
 [17]
 

 In sum, we conclude that all the fraud judgments entered against the defendants must be reversed because the evidence was insufficient to support a finding the plaintiffs relied on any misrepresentations made by the defendants.
 
 [18]
 

 II
 
 *
 

 
 *1360
 
 III
 

 Punitive Damages
 

 A.
 
 Award of Punitive Damages on a Strict Products Liability Claim
 

 The plaintiffs argue reversal is not required merely because we have reversed the fraud judgments since punitive damages could have been awarded on the strict liability judgments.
 
 [25]
 
 We disagree, since there is a reasonable probability the punitive damages were based on the erroneous fraud findings, and we conclude an award of punitive damages based on the strict liability judgments in this case would not be proper
 
 [26]
 

 Civil Code section 3294 governs the award of punitive damages. It states, in pertinent part:
 

 “(a) In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.
 

 “(c) As used in this section, the following definitions shall apply:
 

 “(1) ‘Malice’ means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others. . . .
 

 “(2) ‘Oppression’ means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person’s rights.
 

 
 *1361
 
 “(3) ‘Fraud’ means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury.”
 

 Nonintentional torts may support punitive damages when the conduct involves conscious disregard of the rights or safety of others.
 
 (Peterson
 
 v.
 
 Superior Court
 
 (1982) 31 Cal.3d 147, 158 [181 Cal.Rptr. 784, 642 P.2d 1305].) “Nonintentional conduct comes within the definition of malicious acts punishable by the assessment of punitive damages . . . .”
 
 (Ford Motor Co.
 
 v.
 
 Home Ins. Co.
 
 (1981) 116 Cal.App.3d 374, 381 [172 Cal.Rptr. 59].) “[T]o establish malice, it is not sufficient to show only that the defendant’s conduct was negligent, grossly negligent or even reckless. [Citation.] There must be evidence that defendant acted with knowledge of the probable dangerous consequences to plaintiff’s interests and deliberately failed to avoid these consequences.”
 
 (Flyer’s Body Shop Profit Sharing Plan
 
 v.
 
 Ticor Title Ins. Co.
 
 (1986) 185 Cal.App.3d 1149, 1155 [230 Cal.Rptr. 276].)
 

 The plaintiffs argue punitive damages may be awarded in a strict liability case even when no personal injury occurs.
 
 [27]
 
 To support their position, the plaintiffs rely on
 
 SKF Farms
 
 v.
 
 Superior Court
 
 (1984) 153 Cal.App.3d 902 [200 Cal.Rptr. 497].
 
 SKF Farms,
 
 however, is readily distinguishable.
 
 SKF Farms
 
 is a strict liability case but it is not a products liability case; it involves strict liability imposed on ultrahazardous activities (crop dusting), i.e., an activity which “create[s] such a serious risk of danger that it is justifiable” to impose liability without fault. (See 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1228, pp. 662-663.) In contrast to
 
 SKF Farms,
 
 in every strict products liability case in California cited by the plaintiffs in their briefs, a personal injury occurred. (See, e.g.,
 
 Peterson
 
 v.
 
 Superior Court, supra,
 
 31 Cal.3d 147;
 
 Grimshaw
 
 v.
 
 Ford Motor Co.
 
 (1981) 119 Cal.App.3d 757, 808 [174 Cal.Rptr. 348];
 
 Marks
 
 v.
 
 Minnesota Mining & Manufacturing Co.
 
 (1986) 187 Cal.App.3d 1429 [232 Cal.Rptr. 594];
 
 G. D. Searle & Co.
 
 v.
 
 Superior Court
 
 (1975) 49 Cal.App.3d 22 [122 Cal.Rptr. 218].)
 

 
 *1362
 
 Plaintiffs argue even if punitive damages were not justified here on the basis the defendants acted in conscious disregard of the safety of others, nonetheless punitive damages were justified because their “rights” were violated. Coles points to language in
 
 G. D. Searle & Co.
 
 v.
 
 Superior Court, supra,
 
 49 Cal.App.3d at page 32, stating “[i]n a personal injury action the notion of conscious disregard of the
 
 safety
 
 of others logically may be substituted for that of disregard of the
 
 rights
 
 of others” (italics in original), and argues this passage suggests that disregard of the rights of others may justify punitive damages in a non-personal injury context. (See also Civ. Code, § 3294, subd. (c)(1) [reference in the definition of malice to conduct by the defendant “with a willful and conscious disregard of the rights or safety of others”].) The plaintiffs assert there was substantial evidence showing their “rights” were violated.
 

 The plaintiffs, however, do not identify precisely what “rights” were violated. As to the homeowners who suffered no leaks, the only “right” we can identify is the “right” not to have a product which might fail in the future. Since such a “right” is not sufficient under public policy considerations to support a strict products liability claim, it follows such a “right” would not be sufficient to support an award of punitive damages.
 

 As to the remaining plaintiffs, the only right appears to be a “right” not to have a leaking plumbing system. The plaintiffs state the defendants acted in conscious disregard of this right because the defendants “knew the probable injurious consequences of their conduct and deliberately failed to avoid them,” “knew the defective plumbing system had leaked extensively before Briarwood was plumbed,” “knew it was installed in attics, creating the serious danger ceilings would collapse,” and “nevertheless continued to design, promote, and sell the defective plumbing system.”
 

 We observe two problems with the plaintiffs’ argument. First, to accept the plaintiffs’ argument that they should be awarded punitive damages because the defendants sold or manufactured a defective product and the defendants had knowledge of the defects, would result in punitive damages being routinely awarded in strict products liability cases. The situation the plaintiffs describe is common in strict products liability cases.
 
 [28]
 
 An award of punitive damages requires “ ‘[something more than the mere commission of a tort.’ ”
 
 {Taylor
 
 v.
 
 Superior Court
 
 (1979) 24 Cal.3d 890, 894 [157 Cal.Rptr.
 
 *1363
 
 693, 598 P.2d 854].) We believe this type of products liability case, where the plaintiffs suffered no personal injury or any other egregious injury does not merit an award of punitive damages.
 

 Second, the plaintiffs’ argument is really a variant of the fraud argument, i.e., it is based on the allegedly false representations (and omissions) the defendants made about the plumbing system. As we have already concluded, the plaintiffs were not entitled to recover on a fraud theory. Therefore, the fraud theory cannot be used to support the award of punitive damages; it would be anomalous to prevent the plaintiffs from recovering compensatory damages under a fraud theory and yet allow them to recover punitive damages using a theory that would not support the award of compensatory damages.
 

 B.
 
 Award of Punitive Damages to Cole in Absence of a Showing of Actual Damages
 

 *
 

 IV-VI
 
 *
 

 Disposition
 

 The fraud judgments against Shell, Celanese and U.S. Brass are reversed. The strict liability and negligence judgments in favor of those homeowners who had suffered no leaks are reversed. The strict liability and negligence judgments as to the remaining homeowners rendered against Shell and Celanese are reversed. The judgment and award of attorney fees under the Song-Beverly Consumer Warranty Act against U.S. Brass are reversed. All judgments against Admiral Marine are reversed. The punitive damages judgments are reversed. The awards of costs and fees are reversed. In all other respects, the judgments are affirmed.
 

 Each party to bear its own costs on appeal.
 

 Huffman, J., and Nares, J., concurred.
 

 [1]
 

 This amount was offset by other settlements.
 

 [2]
 

 The jury’s award was actually against “U.S. Brass/Eljer,” i.e., against U.S. Brass and its parent companies, Eljer Manufacturing, Inc., and Eljer Industries, Inc. For the sake of convenience, when referring to “U.S. Brass/Eljer,” we use only “U.S. Brass.” In its brief on appeal, the parent and grandparent company suggest the judgment should have been limited to U.S. Brass only but does not argue this as a basis for reversal. We therefore decline to address the issue.
 

 [3]
 

 The jury apportioned liability among the defendants as follows: U.S. Brass: 60 percent; Shell: 26 percent; Celanese: 12 percent; Admiral Marine: 1 percent; and “all other persons”: 1 percent. The jury rejected the theory Shell, U.S. Brass or Celanese was liable for conspiracy to commit fraud.
 

 [4]
 

 The jury awarded punitive damages against the defendants as follows: U.S. Brass: $190,200; Shell: $85,590; and Celanese: $41,210.
 

 [5]
 

 The jury awarded punitive damages of $3.1 million against U.S. Brass, $35.9 million against Shell and $9 million against Celanese.
 

 [6]
 

 The punitive damages against the defendants in favor of Coles were assessed as follows: U.S. Brass: $129,200; Shell: $1,495,800; and Celanese: $375,000.
 

 [7]
 

 Shell acquired the polybutylene manufacturing facility from another company in 1977 after the Qest system had been developed and polybutylene pipe had been used with acetal fittings for a number of years.
 

 [8]
 

 Coles alternatively argues that even if it relied on a fraud-on-the-market theory of reliance,
 
 Mirkin
 
 should not be retroactively applied to “wipe out” its fraud recovery because
 
 Mirkin
 
 announced a new limitation on recovery. We find this argument unpersuasive. As the court in
 
 Mirkin
 
 stated, it was applying “settled” law requiring a showing of actual reliance and no appellate state court had incorporated the fraud-on-the-market theory into the common law of deceit.
 
 (Mirkin
 
 v.
 
 Wasserman, supra,
 
 5 Cal.4th 1082, 1088, 1090.)
 

 [9]
 

 Grinnell
 
 v.
 
 Charles Pfizer & Co.
 
 (1969) 274 Cal.App.2d 424, 441 [79 Cal.Rptr. 369] (plaintiffs, who had not heard or read misrepresentations of pharmaceutical manufacturer, were allowed to sue manufacturer for breach of express warranty because the doctors who administered the drugs had relied on the manufacturer’s representation and acted as the plaintiffs’ agent);
 
 Toole
 
 v.
 
 Richardson-Merrell Inc.
 
 (1967) 251 Cal.App.2d 689, 707 [60 Cal.Rptr. 398, 29 A.L.R.3d 988] (same);
 
 Roberts
 
 v.
 
 Salot
 
 (1958) 166 Cal.App.2d 294, 301 [333 P.2d 232] (property owner allowed to sue for misrepresentations made to property owner’s agent).
 

 [10]
 

 See also
 
 Geemaert
 
 v.
 
 Mitchell
 
 (1995) 31 Cal.App.4th 601 [37 Cal.Rptr.2d 483], stating the “ ‘reason to expect’ ” language in section 533 of the Restatement Second of Torts is not synonymous with “ ‘foreseeability’ ” but “bears more similarity to actual
 
 intent
 
 to cause third party reliance.” (31 Cal.App.4th at p. 607, italics in original.) The
 
 Geemaert
 
 court explained: “ ‘Virtually any misrepresentation is capable of being transmitted or repeated to third persons, and if sufficiently convincing may create an obvious risk that they may act in reliance upon it. . . .
 
 This risk is not enough for the liability covered in this Section. The maker of the misrepresentation must have information that would lead a reasonable man to conclude that there is an especial likelihood that it will reach those persons and will influence their conduct.’
 
 (Rest.2d Torts,
 
 supra,
 
 § 531, com. d, at p. 68, italics added.) This in accord with the holdings of other state and federal courts, which ‘have not gone so far as to extend protection to a plaintiff whose reliance on a fraudulent statement was merely within the foresight of reasonable people . . . .’ [Citation.]”
 
 (Ibid.,
 
 italics in original.)
 

 [11]
 

 In
 
 Varwig,
 
 the court held a plaintiff had stated a cause of action for fraud not only against a used car dealer who sold him a car with the misrepresentation the car had a clear title (the car was subsequently repossessed by a lienholder) but also against the dealer who had sold the car to the used car seller and who had made a representation to the buying dealer that he was receiving transferable title. The court held it was foreseeable the buying dealer would repeat the misrepresentation and thus the false claim of clear title was “an indirect misrepresentation to plaintiff, who purchased the car in reliance upon [the seller’s] repetition of the representation.”
 
 (Varwig, supra,
 
 74 Cal.App.3d at p. 581.) In
 
 Barnhouse,
 
 a property developer when he sold the property told the buyer he had completed work recommended by an engineer because the house was built on landfill in the bed of a diverted stream. This was false. The developer had not followed the engineer’s recommendations and there were other soil and drainage problems which the developer did not reveal to the buyer. The buyer sold the property to the plaintiff who sued the developer for fraud. The court held since the developer had reason to expect there would be subsequent purchasers and the original buyers would repeat the defendant’s fraudulently incomplete representations about the property, the plaintiff was entitled to sue the developer for fraud; the buyer had indirectly relied on the developer’s incomplete representations to the original buyer.
 
 (Barnhouse, supra,
 
 133 Cal.App.3d at pp. 191-193.)
 

 [12]
 

 The City of San Diego adopted the 1979 Uniform Plumbing Code, which did not approve use of polybutylene, but did not adopt the 1982 Uniform Plumbing Code, which for the first time approved use of polybutylene plumbing in residential housing. The city adopted the 1985 Uniform Plumbing Code, which continued the approval of polybutylene but sometime in the mid-1980’s, the city prohibited use of plastic fittings in polybutylene systems.
 

 [13]
 

 He testified the City of San Diego had already approved polybutylene plumbing for at least overhead (as opposed to underground) use. The homeowners here experienced above-ground leaks, primarily in the ceilings.
 

 [14]
 

 Joseph Pierpaoli, a field inspector and senior mechanical inspector of the San Diego Building Inspection Department, testified the department had approved the use of polybutylene plumbing in 1978.
 

 [15]
 

 Beauchamp was later the building inspection manager for the City of Vista beginning in 1981 and testified about a U.S. Brass presentation in the spring of 1984 recommending the use of metal rather than plastic crimping rings. Beauchamp, however, was not involved in the approval process for polybutylene plumbing, which had already been approved by the City of Vista when he was hired.
 

 [16]
 

 There was specific testimony by several homeowners that they did not know what type of plumbing system had been installed in the homes at the time they purchased.
 

 [17]
 

 Compare
 
 Amstadt
 
 v.
 
 United States Brass Corporation
 
 (Tex. 1996) 919 S.W.2d 644, 650-652, holding that no recovery was permitted under Texas’s Deceptive Trade Practices-Consumer Protection Act (Tex. Bus. & Com. Code Ann., §§ 17.41 to 17.63 [cause of action for false, misleading, or deceptive acts or practices]) for homeowners in whose homes polybutylene plumbing had been installed because the alleged misrepresentations never reached the homeowners and were not made in connection with the consumer transaction, i.e., the purchase of homes. Note also
 
 Bay Summit Community Assn.
 
 v.
 
 Shell Oil Co.
 
 (1996) 51 Cal.App.4th 762, 767 [59 Cal.Rptr.2d 322], where other homeowners in San Diego suing for leaks in a polybutylene plumbing system conceded
 
 Mirkin
 
 precluded their fraud cause of action against Shell because they failed to prove reliance.
 

 [18]
 

 Since we have reversed the fraud judgments, we need not separately discuss whether reversal is required based on other grounds, i.e., error occurred in admitting the evidence of the defendants’ post-January 1983 knowledge of the defects, in admitting evidence of prior settlements, in instructing the jury certain entities were agents of the defendants and because plaintiffs counsel committed misconduct in referring to “continuing fraud,” a duty to recall and the statute of limitations. We suspect the plaintiffs presented their best evidence in this case and therefore it is speculative as to whether there will be a retrial where these issues will arise again. For similar reasons, we decline to discuss the homeowners’ contentions they should have been allowed to present emotional distress evidence relevant to their fraud claim or that the court erred in excluding the testimony of Raymond Leonardini whose evidence was relevant to the conspiracy to commit fraud and fraud claims.
 

 *
 

 See footnote,
 
 ante,
 
 page 1341.
 

 [25]
 

 Since we have not reversed all of the strict liability judgments as to U.S. Brass, we address whether punitive damages could be properly awarded based on a strict products liability theory.
 

 [26]
 

 The homeowners also argue the definition of fraud contained in Civil Code section 3294, subdivision (c)(3) does not require a finding of actual reliance on the misrepresentation. In
 
 Mirkin
 
 v.
 
 Wasserman, supra,
 
 5 Cal.4th l082,1091-1.093, the Supreme Court rejected a similar argument. The
 
 Mirkin
 
 plaintiffs argued that since the statutes related to the tort of deceit (Civ. Code, §§ 1709, 1710, 1711) did not expressly require actual reliance, they were not required to prove reliance. The
 
 Mirkin
 
 court rejected the argument, explaining the law of deceit is not purely statutory but is a mixture of statutory and common law. (5 Cal.4th at p. 1091.) Similarly here Civil Code section 3294, subdivision (c)(3) involves a mixture of statutory law and common law; i.e., a statute incorporating the common law definition. Accordingly, we reject the homeowners’ argument.
 

 [27]
 

 The homeowners contend the court erroneously excluded testimony of a witness that would have shown the plumbing system presented a safety issue. This witness, who was not a plaintiff, would have testified about a broken hot water line which saturated the ceiling in a bedroom and caused the ceiling, insulation and hot water to collapse on to a child, causing injuries, including first and second degree bums and residual scarring. The court properly excluded this evidence under Evidence Code section 352 since it was cumulative to other evidence about collapsing ceilings due to plumbing leaks. We further note this homeowner was not a member of the class and there were some indications the pipe failure in that case involved a different plumbing problem, which tended to undercut its relevance and could have confused the jury.
 

 [28]
 

 Note, for example, that one of the tests for determining whether a product has a design defect is whether “ ‘the benefits of the . . . design outweigh the risk of danger inherent in such design.’ ”
 
 (Soule
 
 v.
 
 General Motors Corp.
 
 (1994) 8 Cal.4th 548, 567 [34 Cal.Rptr.2d 607, 882 P.2d 298].) Under such a test, a manufacturer may frequently be aware that there is a “defect" in the product, in the sense that it is not safe under all circumstances, but such defect may not support a strict liability recovery if the defect is outweighed by the benefits of the design.
 

 *
 

 See footnote,
 
 ante,
 
 page 1341.